# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-13-00211-CV

**Teladoc, Inc., Appellant**

**v.**

**Texas Medical Board and Nancy Leshikar,
in her Official Capacity as General Counsel of the Texas Medical Board, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. D-1-GN-11-002115, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING**

### O P I N I O N

We again confront the recurrent question of whether an "informal" written agency pronouncement regarding law or policy constitutes a "rule" as the Administrative Procedure Act (APA)[1] defines that term.[2] In this case, a professional regulatory agency sent a letter to the primary statewide association representing the regulated population warning that certain practices violated agency rules and would lead to disciplinary action. The agency's pronouncement went beyond a mere restatement of its existing formally promulgated rules or underlying statutes. We have little difficulty concluding that the substance and nature of this pronouncement distinguishes it as a "rule" under the APA.

---

[1] The APA is codified in chapter 2001 of the Texas Government Code. *See* Tex. Gov't Code §§ 2001.001–.902.

[2] *See id*. § 2001.003(6).

**BACKGROUND**

As its name suggests, Teladoc, Inc., the appellant, is in the business of providing health-care consumers access to a network of physicians who dispense medical services by telephone. The basic features of Teladoc's business model are undisputed. Through a website, an individual consumer creates a personal account, provides access to personal information and medical records, and can request consultation with a physician when the need arises. In that event, a responding physician will access and review the patient's information and medical records through the website, then call the patient by telephone and consult with him or her. Based on the medical records and history, the patient's reported symptoms, and other information the physician elicits during the consultation, the physician dispenses medical advice and, when deemed appropriate, can prescribe certain medications.[3] A nurse reviews any resulting prescriptions for allergies or potential drug interactions before submission to the patient's pharmacy. The consulting physician enters notes and findings into the patient's electronic health record, which is immediately made available to the patient and the patient's primary-care physician.

Teladoc has operated in Texas since 2005, and its clientele currently includes several large public and private health plans and managed-care organizations.[4] But in June 2011,

---

[3] Teladoc has emphasized that its physicians do not prescribe drugs that have a demonstrated risk of abuse, such as narcotics, or non-therapeutic drugs like Viagra.

[4] Teladoc indicates, and the Texas Medical Board does not dispute, that its customers currently include "the entire commercially-insured population of Aetna in the State of Texas, as well as several large group employers . . . and over three hundred smaller employers through non-Aetna plans[,] . . . 800,000 members of the Texas State Medicaid managed care population, . . . approximately 25,000 individuals within the Medicare population, . . . and a number of children in foster care for the Texas Health and Human Services Commission."

2

the Texas Medical Board (TMB or the Board)—the administrative agency that licenses and regulates physicians in this state, including those participating in Teladoc's network[5]—wrote Teladoc a letter taking issue with "several recent representations by Teladoc regarding its internet program" that, in TMB's view, indicated that physicians would be "jeopardizing their respective licenses should they choose to participate" in Teladoc's network.

The letter attacked "Teladoc[] advertising materials" for indicating that the physicians in its network can provide medical services "over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination," asserting that this practice violated "Board Rule 190.8(1)(L)." That rule, codified in Title 28 of the Texas Administrative Code at section 190.8(1)(L), is included among a non-exclusive list of physician acts and omissions that TMB has deemed to constitute the "fail[ure] to practice medicine in an acceptable professional manner consistent with public health and welfare" under the Medical Practice Act.[6] The referenced paragraph (L) specifically prohibits physicians from prescribing "any dangerous drug or controlled substance without first establishing a proper professional relationship with the patient."[7] Since

---

[5] *See* Tex. Occ. Code § 152.001 (creating TMB); *see generally id.* §§ 151.001–168.202 (Medical Practice Act). There is no contention that Teladoc itself is practicing medicine or is otherwise directly subject to TMB's regulatory authority.

[6] 22 Tex. Admin. Code § 190.8(1) (TMB, Violation Guidelines); *see* Tex. Occ. Code §§ 153.001 (TMB's rulemaking authority), 164.051(a)(6) ("The board may refuse to admit a person to its examination or refuse to issue a license to practice medicine and may take disciplinary action against a person if the person . . . fails to practice medicine in an acceptable professional manner consistent with public health and welfare.").

[7] 22 Tex. Admin. Code § 190.8(1)(L).

November 2003, and at all times relevant to this case, subparagraph (i) of paragraph (L) has prescribed the requirements for creating a "proper professional relationship" as follows:

    (i)    A proper relationship, at a minimum requires:

        (I)    establishing that the person requesting the medication is in fact who the person claims to be;

        (II)    establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing. An online or telephonic evaluation by questionnaire is inadequate;

        (III)    discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

        (IV)    ensuring the availability of the licensee or coverage of the patient for appropriate follow-up care.[8]

According to TMB, the requirements set forth in (II)—"Rule 190.8(1)(L)(i)(II)"—meant that the "acceptable medical practices" entailed in "establishing a diagnosis" (and, in turn, initiating a "proper" physician-patient relationship) must always include a "'face-to-face' physical examination." As TMB would later elaborate, this construction rested upon two related premises: (1) the "physical examination" contemplated in Rule 190.8(1)(L)(i)(II) entails a "face-to-face" examination; and, more critically, (2) the rule's reference to "acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing" means that physicians must perform *all four* enumerated procedures or their equivalent. In TMB's view,

---

[8] 28 Tex. Reg. 10496, 10497 (2003) (codified at 22 Tex. Admin. Code § 190.8(1)(L)(i)).

4

the "face-to-face" physical examination component of these requirements precluded a physician from making an initial diagnosis by telephone.

TMB's letter similarly criticized Teladoc for purportedly advertising that the telephone consultations it provides are not within the scope of revised rules governing "telemedicine" that the agency promulgated in 2010. Telemedicine, simply described, refers to medical services provided over the Internet or other "advanced communication technology" enabling an off-site physician to see and hear the patient in real time.[9] TMB's 2010 telemedicine rules, codified in chapter 174 of title 22 of the Texas Administrative Code,[10] incorporate an explicit concept of "face-to-face visit," defined as "[a]n evaluation performed on a patient where the provider and patient are both at the same physical location" unless the patient is located at a medical facility qualifying as an "established medical site."[11] When a patient is located at an "established medical site," the rules permit a "distant site provider" to use "telemedicine medical services . . . for all patient visits, including initial evaluations to establish a proper physician-patient relationship

---

[9] *See* 22 Tex. Admin. Code § 174.2(10) (TMB, Definitions) (defining "Telemedicine Medical Services" as "[t]he practice of medical care delivery, initiated by a distant site provider, who is physically located at a site other than the site where the patient is located, for the purposes of evaluation, diagnosis, consultation, or treatment which requires the use of advanced telecommunications technology that allows the distant site provider to see and hear the patient in real time"); *see also* Tex. Gov't Code § 531.001(8) (defining same phrase as "a health care service initiated by a physician or provided by a health professional, diagnosis or consultation by a physician, treatment, or the transfer of medical data that requires the use of advanced telecommunications technology").

[10] *See* 22 Tex. Admin. Code §§ 174.1–.12 (TMB Telemedicine rules).

[11] *See id*. § 174.2(3) (defining "face-to-face visit"); *see also id*. § 174.2(2) (defining "established medical site").

between a distant site provider and a patient."[12]  However, when a patient is located somewhere

other than an "established medical site," a distant site provider may not provide telemedicine

medical services without first "see[ing] the patient one time in a face-to-face visit" or receiving a

referral from another physician who has performed an in-person evaluation of the patient.[13]  The

telemedicine rules additionally include a provision, Rule 174.8, that addresses the initial creation of

the physician-patient relationship in a manner similar to Rule 190.8(1)(L)(i):

> (a)  Evaluation of the Patient.  Distant site providers who utilize telemedicine medical services must ensure that a proper physician-patient relationship is established which at a minimum includes:
>
>> (1)  establishing that the person requesting the treatment is in fact whom he/she claims to be;
>>
>> (2)  establishing a diagnosis through the use of acceptable medical practices, including patient history, mental status examination, physical examination (unless not warranted by the patient's mental condition), and appropriate diagnostic and laboratory testing to establish diagnoses, as well as identify underlying conditions or contra-indications, or both, to treatment recommended or provided;
>>
>> (3)  discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

---

[12]  *Id.* § 174.6 (TMB, Telemedicine Medical Services Provided at an Established Medical Site).

[13]  *See id.* § 174.7(a) (TMB, Telemedicine Medical Services Provided at Sites other than an Established Medical Site).  The same rule additionally requires that any such patients obtain an annual "in-person" evaluation by a physician and that existing patients receive face-to-face visits within 72 hours after receiving telemedicine medical services related to new symptoms.  *See id.* § 174.7(c), (e).

6

(4)     ensuring the availability of the distant site provider or coverage of the patient for appropriate follow-up care.[14]

Subparagraph (2) generally corresponds to Rule 190.8(1)(L)(i)(II), but with an obvious textual difference—whereas Rule 190.8(1)(L)(i)(II) requires "establishing a diagnosis through the use of acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing,"[15] Rule 174.8(a)(2) requires "establishing a diagnosis through the use of acceptable medical practices, *including* patient history, mental status examination, physical examination . . . and appropriate diagnostic and laboratory testing."[16]

While acknowledging that "phone consults were deleted from the [2010 telemedicine] rule as adopted," TMB in its letter insisted—notwithstanding the textual differences between the enactments—that this exclusion had reflected its position "both initially and throughout the [rulemaking] process" that the more general Rule 190.8(1)(L)(i)(II) had already required "'face-to-face' consults [as] the only appropriate manner in which to establish a physician/patient relationship." The telemedicine rules had departed from this policy, TMB claimed, only to the extent of "allow[ing] for situations in which th[e] required 'face-to-face' examination could be accomplished through the use of the [I]nternet." TMB also emphasized that Teladoc had commented

---

[14]  *Id*. § 174.8(a) (TMB, Evaluation and Treatment of the Patient).

[15]  *Id.* § 190.8(1)(L)(i)(II) (emphasis added).

[16]  *Id.* § 174.8(a)(2) (emphasis added).

7

in opposition to the telemedicine rules when proposed,[17] characterizing the company as having "maintain[ed] throughout the rulemaking process that 'face-to-face' examinations were not necessary to establish a physician/patient relationship," and portraying the agency's response as a repudiation of that position not only with respect to the telemedicine rules, but also Rule 190.8(1)(L)(i)(II).[18]

Based on TMB's view of Rule 190.8(1)(L)(i)(II) and the rule's relationship with the 2010 telemedicine rules, TMB accused Teladoc of "unconscionable" "misrepresentation" in advertising or representing that "its process can be conducted over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination." TMB added that "[t]hese statements . . . if followed by licenced Texas physicians, will lead to disciplinary action against the participating doctors in the program." The agency also threatened that "any representation that you [Teladoc] make regarding Teladoc's program being in compliance with Board rules will be directly and firmly refuted by the Board" and that "[t]he Board will take all legal steps as are necessary should it see continued advertisements containing the material referenced above."

Of final note, the letter advised that "[b]y copy hereof, the Board is sending this correspondence to the Texas Medical Association," and a copy was indeed transmitted by overnight delivery to TMA's Vice President and General Counsel. TMA, as TMB acknowledges, is the chief

---

[17] Teladoc or affiliates evidently offer medical services over the Internet in other states.

[18] The letter represents, for example, that "as Teladoc described its practices before the Board members sitting on the rulemaking committee, Teladoc was told that it was then violating Board rules and if it continued in that vein it would continue to be in violation of Board rules."

statewide association representing the Texas medical profession, with over 48,000 physician and medical student members.[19]

In response to this letter and its implications for Teladoc's ability to do business in Texas, the company sued TMB under section 2001.038 of the APA, which authorizes declaratory-judgment claims against a state agency to challenge the "validity" or "applicability" of a "rule."[20] Teladoc contended that TMB's letter—or, more precisely, the agency's pronouncements therein concerning the construction and effect of Rule 190.8(1)(L)(i)(II)—was in itself a "rule" under the APA.[21] Because TMB unquestionably did not comply with the APA's notice-and-comment rulemaking requirements before promulgating this new "rule," Teladoc prayed that the "rule" be declared void under APA section 2001.035.[22] In the alternative, Teladoc prayed that the

---

[19] As if to emphasize this fact, our oral-argument docket on the day we heard Teladoc's appeal also included, by happenstance, one of the many scope-of-practice lawsuits TMA has initiated over the years on behalf of the Texas medical profession.

[20] *See* Tex. Gov't Code § 2001.038(a) ("The validity or applicability of a rule . . . may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair a legal right or privilege of the plaintiff."), (c) ("The state agency must be a party to the action."); *see also Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 700 (Tex. App.—Austin 2011, no pet.) (explaining that section 2001.038 waives sovereign immunity to the extent of the relief it authorizes) (citing *Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.)).

[21] *See* Tex. Gov't Code § 2001.003(6) (defining "rule").

[22] *See id*. §§ 2001.0225–.034 (rulemaking procedures), .035 ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").

9

district court remand the "rule" to TMB, pursuant to APA section 2001.040, to afford the agency the opportunity to readopt or revise through proper APA procedures.[23]

Teladoc subsequently sought summary judgment on its claims. TMB countered with a cross-motion for summary judgment challenging whether its June 2011 letter had constituted a "rule" under the APA and, in turn, whether Teladoc's claims had invoked the district court's jurisdiction via section 2001.038.[24] Concluding that "the June 16, 2011 letter . . . is not an

---

[23] *See id*. § 2001.040 ("If a court finds that an agency has not substantially complied with one or more of the procedural requirements of Sections 2001.0225 through 2001.034, the court may remand the rule, or a portion of the rule, to the agency and, if it does so remand, shall provide a reasonable time for the agency to either revise or readopt through established procedure.").

In addition to the declaratory relief it sought, Teladoc also asserted claims for temporary and permanent injunctive relief to restrain the "rule's" enforcement. The district court granted a temporary restraining order, which was ultimately extended through judgment by agreement. On appeal, however, Teladoc does not appear to complain of the district court's dismissal of its claims for injunctive relief.

Teladoc also named as a defendant the TMB officer who had written the June 2011 letter on the agency's behalf—general counsel Nancy Leshikar, in her official capacity. At least with respect to Teladoc's claim for declaratory relief under APA section 2001.038, this amounts to a duplicative but harmless pleading of the same claim for relief against the same defendant, TMB. *See Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 750 (Tex. App.—Austin 2014, pet. filed) (suggesting that where sovereign immunity has been waived by APA section 2001.038 so as to permit suit against an agency, it is of no substantive consequence that claimant also named agency official as a defendant to that claim) (citing *Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007); *cf. Texas State Bd. of Pharmacy v. Witcher*, __S.W.3d__, No. 03-12-00560-CV, 2014 WL 5654255, at *20 (Tex. App.—Austin Oct. 31, 2014, pet. filed) (reasoning that where agency's immunity from suit was waived by section 2001.171 of the APA, immunity was likewise waived as to agency officers sued in their official capacities) (citing *Koseoglu*, 233 S.W.3d at 844). For convenience, however, we refer to the relevant defendant solely as TMB.

[24] *See Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 544–45 (Tex. App.—Austin 2011, pet. denied) ("From the face of the statute, a challenged agency action that constitutes a 'rule' is among the facts (more precisely, a mixed question of law and fact) that must exist in order for a claimant to successfully invoke, via section 2001.038, a trial court's subject-matter jurisdiction over the claim for relief authorized by the statute. If there is no 'rule' as defined

unpublished 'rule' within the meaning of the [APA]," the district court rendered judgment denying Teladoc's motion and granting TMB's cross-motion, in effect sustaining the agency's jurisdictional challenge. This appeal ensued.

## ANALYSIS

Teladoc brings two issues on appeal. In the first, Teladoc argues that TMB's June 2011 letter constitutes a "rule" under the APA as a matter of law, such that the district court erred in denying Teladoc's summary-judgment motion and granting TMB's. Teladoc further prays that we render judgment against TMB declaring the "rule" invalid or, alternatively, remanding it to TMB under APA section 2001.040. In its second issue, urged in the alternative, Teladoc contends that even if it is not entitled to summary judgment, TMB has likewise failed to meet its summary-judgment burden, such that we should reverse the district court's judgment and remand for further proceedings.

**Standard of review**

We review the district court's summary-judgment rulings de novo.[25] Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[26] Where, as here, both sides move for summary judgment and the

---

by the APA being challenged, in other words, the claimant cannot obtain the declaratory relief the statute authorizes against the State, its agencies, or its agents, because sovereign immunity would bar the cause of action.") (citing *Combs v. City of Webster*, 311 S.W.3d 85, 100–01 (Tex. App.—Austin 2009, pet. denied)).

[25] *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

[26] Tex. R. Civ. P. 166a(c); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291 (Tex. 2004).

11

trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the district court should have rendered.[27]

In this case, the pivotal summary-judgment issue turns on application of statutes and rules to undisputed facts—whether TMB's June 2011 letter, whose contents are in the record and undisputed, qualifies as a "rule" as the APA has defined that term.[28]  If the letter is not a "rule," Teladoc failed to invoke the district court's jurisdiction through APA section 2001.038.[29]  If, on the other hand, the letter is a "rule," Teladoc both properly invoked the district court's jurisdiction through section 2001.038 and established its entitlement to summary judgment on its declaratory claim under that statute, as it is undisputed that TMB did not promulgate the letter in accordance with the APA's notice-and-comment rulemaking requirements.[30]

Construction of both statutes and administrative rules presents questions of law that we review de novo under traditional principles of statutory construction.[31]  Our primary objective

---

[27] *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

[28] Teladoc also emphasizes summary-judgment evidence of what it characterizes as TMB's prior explicit or tacit agreement that initial physician-patient consultations by telephone satisfy Rule 190.8(1)(L)(i)(II).  Because we conclude the contents of the letter itself conclusively establish that it is a "rule," we need not address this additional evidence or its possible implications.

[29] *See, e.g.*, *Slay*, 351 S.W.3d at 544–45, 548.

[30] *See, e.g.*, *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008); *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 723–24 (Tex. App.—Austin 2009, no pet.).

[31] *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) (holding that administrative rules are interpreted under principles of statutory construction); *City of Rockwall*

is to ascertain and give effect to the drafters' intent.[32]  We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided.[33]  We consider the statutes or rules as a whole rather than their isolated provisions.[34]  We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully.[35]

**A rule?**

The APA defines a "rule" as follows:

"Rule":

(A)     means a state agency statement of general applicability that:

(i)     implements, interprets, or prescribes law or policy; or

(ii)    describes the procedure or practice requirements of a state agency;

(B)     includes the amendment or repeal of a prior rule; and

---

v. *Hughes*, 246 S.W.3d 621, 625 (Tex. 2008) ("Statutory construction is a legal question we review de novo.").

[32] *See TGS-NOPEC*, 340 S.W.3d at 439 (citing Tex. Gov't Code § 312.005; *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004)).

[33] *See id.* (citing Tex. Gov't Code § 311.011(b)).

[34] *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)).

[35] *See id.* (citing *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008)).

13

      (C)     does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.[36]

Teladoc asserts that TMB's letter satisfies each element of this definition. TMB does not dispute that its letter is a "state agency statement," as required by (A), and it plainly is—it purports to speak for the Board, conveying its official position, and there is no contention that the writer, the agency's general counsel, was acting with anything less than the Board's full authority.[37] Similarly, the statement obviously "implements, interprets, or prescribes law or policy," reflecting the Board's construction and application of Rule 190.8(1)(L)(i)(II) and the underlying statutory concept of practicing medicine "in an acceptable professional manner consistent with public health and welfare."[38] The statement likewise implements a broader policy judgment by the Board, reflected explicitly in the 2010 telemedicine rules, that the creation of a new physician-patient relationship should generally entail an in-person physical examination.[39] The statement would also impact

---

[36] Tex. Gov't Code § 2001.003(6).

[37] *See Entertainment Publ'ns*, 292 S.W.3d at 718, 721–22 (letter signed by the "Assistant Director of Tax Administration" of the Comptroller's office conveying Comptroller's construction of tax laws was a "rule" under the APA; noting that "the Comptroller does not contend that the signer of the letter was acting with anything less than her full authority").

[38] *See id.* at 721 ("There is no question" that letters conveying Comptroller's construction of tax laws are "statements implementing, interpret[ing], or prescribing law or policy," as they "interpret[ed] the tax code to mean that [brochure-fundraising] firms are, for purposes of collecting and remitting sales tax, always the 'sellers' of the taxable items.").

[39] *See El Paso Hosp. Dist.*, 247 S.W.3d at 714 (HHSC's "February 28 cutoff" used in calculating Medicaid reimbursement rates "implements law" and "implements policy"); *Witcher*, 2014 WL 5654255, at *7 ("The Board's disciplinary order . . . leave[]s little doubt" that Board's de facto "reciprocal-sanctions" requirement "is a statement implementing, interpreting, or prescribing the agency's policy . . . .").

14

private rights and not merely internal agency management or organization, thereby negating the exception in (C)—TMB unambiguously and definitively asserts that a physician's provision of prescriptions or other medical services "over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination" violates Rule 190.8(1)(L)(i)(II) and will prompt legal action that includes "disciplinary action against the participating doctors."[40]

TMB joins issue, however, as to whether the letter represents an agency statement of "general applicability." Agency statements of "general applicability" refer to those "that affect the interest of the public at large such that they cannot be given the effect of law without public comment," as contrasted with statements "made in determining individual rights."[41] Its letter does not meet this requirement, TMB insists, because it was "directed only at Teladoc." That narrow characterization is conclusively refuted by the contents of the letter itself. While the letter certainly seeks in part to influence or impede Teladoc's Texas operations, it also pronounces a rule construction that impacts all physicians practicing in this state—accompanied by a threat of "disciplinary action" against any physicians who would dare to deviate from the Board's view.[42] The

---

[40] See Witcher, 2014 WL 5654255, at *7 (noting that Board's order was essentially statement that it was "duty bound" to impose disciplinary action based on interpretation); Entertainment Publ'ns, Inc., 292 S.W.3d at 722 (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation . . . in all future cases" involving similar facts); see also Witcher, 2014 WL 5654255, at *10 (distinguishing Board of Pharmacy's reciprocal-sanctions "rule" from the non-binding evaluative sanctions guidelines addressed in Slay, 351 S.W.3d at 537–42, 546–48).

[41] See Entertainment Publ'ns, Inc., 292 S.W.3d at 721 (quoting El Paso Hosp. Dist., 247 S.W.3d at 714; Railroad Comm'n v. WBD Oil & Gas Co., 104 S.W.3d 69, 79 (Tex. 2003)).

[42] See id. at 721–22 (Comptroller's letters regarding tax treatment of brochure-fundraising firms "apply not only to Entertainment and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.").

15

letter is also pointedly copied to TMA, the chief statewide professional organization representing Texas physicians and medical students. In short, the letter and the manner of its dissemination are plainly calculated to place the regulated public—Texas physicians—on notice of the agency's legal pronouncement and the accompanying threat of adverse consequences if they fail to comply.[43]

A potentially more complicated question on which the parties diverge is whether the pronouncements in the letter should be considered to have any legal effect or significance independent of what is already contained in Rule 190.8(1)(L)(i)(II). Subpart (B) of the APA's definition states that a "rule" "includes the amendment or repeal of a prior rule."[44] While "includes" denotes that a "rule" may include agency statements beyond those that amend or repeal an existing rule, "this indicia of a 'rule,'" as we have previously observed, "is nonetheless illustrative of the types of agency actions that would [be considered to] have legal effect on private persons, as

---

[43] *See id.* at 722 ("[W]hile the interpretation [of Tax Code in letters] would bind agency employees to apply the rule in analyzing the tax responsibilities to parties to these sales, it is not directed 'only' to the 'internal management or organization of a state agency.' Rather, it is aimed at placing the regulated public on notice of the Comptroller's prospective, blanket application of [the] tax code.") (internal citation omitted); *see also id*. (concluding that the manifested "intent of the agency, the prescriptive nature of the [letters], and the context in which the agency statement was made" distinguished them as a "rule") (quoting *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994)).

Similarly misplaced is TMB's reliance on *Beacon National Insurance Co. v. Montemayor*, which rejected an attempted APA section 2001.038 challenge to an asserted "rule" consisting "only [of] a series of letters between Beacon and TDI and a proposed consent decree submitted to Beacon by TDI." 86 S.W.3d 260, 268–69 (Tex. App.—Austin 2002, no pet.). The *Beacon* Court emphasized that "the correspondence from TDI about which Beacon complains is directed at Beacon only" and did not "equate to a specific agency rule, set of requirements, or specific policy." *Id*. 268–69. None of that is true of TMB's letter here.

[44] Tex. Gov't Code § 2001.003(6)(B).

16

contemplated by [(C)]."[45]  Consequently, as we explained in *Sunset Transportation*, "an informal agency statement that does no more than merely restate its own formally promulgated rules would not in itself be a 'rule,'"adding that this proposition is perhaps one of the few that can be discerned with "relative certainty" in this notoriously muddled corner of the law.[46]  But in the aftermath of the Texas Supreme Court's *El Paso Hospital* decision, it is equally clear that an agency's "interpretations" or "applications" of existing formally promulgated rules will themselves be held to be "rules" where they have the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's "rule" definition are met.[47]  Similarly, the bare fact that an agency statement might be said to "interpret" or effectuate only standards already prescribed in existing statutes or rules, as opposed to creating new standards, cannot categorically mean that the statement lacks the sort of legal effect on private persons that distinguishes a "rule," as the same would be true of any "agency statement of general applicability that . . . interprets . . . law," and the Legislature has explicitly included such statements within the Texas APA's definition of "rule."[48]

---

[45]  *Sunset Transp.*, 357 S.W.3d at 704.

[46]  *Id*. at 703; *accord Texas Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 904 (Tex. App.—Austin 2009, no pet.) (DPS internal memorandum prescribing that drivers' licenses will include statement of bearer's immigration status "merely reiterates" rule already imposing that requirement).

[47]  *See El Paso Hosp. Dist*., 247 S.W.3d at 714–15 (holding agency statement to be a "rule" despite agency's insistence that it "is not a rule itself, but rather its interpretation of the [existing] rule"). *Accord Witcher*, 2014 WL 5654255, at *9–10.

[48]  *See* Tex. Gov't Code § 2001.003(6)(A); *see also Entertainment Publ'ns*, 292 S.W.3d at 723 n.6 (acknowledging that the Court's analysis reached the same conclusion as would applying Professor Ron Beal's analysis to identify an "interpretive rule") (citing Ron Beal, *A Miry Bog Part II:  UDJA and APA Declaratory Judgment Actions and Agency Statements Made Outside a Contested Case Hearing Regarding the Meaning of the Law*, 59 Baylor L. Rev. 267,

17

The "agency statement" held to be a "rule" in *El Paso Hospital* was HHSC's "interpretation" of its formally promulgated rules governing calculation of Medicaid reimbursement rates to divine a temporal cut-off for the data set that was not found in the text of the existing rules.[49] A more recent example of an agency rule "interpretation" held to itself constitute a "rule" is found in this Court's *Witcher* decision, in which the Board of Pharmacy had applied a multi-factor sanctions rule in a manner that effectively made only one of the factors singularly dispositive.[50] At the opposite end of the spectrum is the situation we addressed in *Sunset Transportation*, where the asserted "rule"—an informational "notice" issued by the Texas Department of Transportation concerning regulatory changes impacting certain interstate motor carriers[51]—was substantively identical to the agency's formally promulgated rules.[52] We further observed that "distinguishing a

---

270 (2007); Ron Beal, *The APA and Rulemaking: Lack of Uniformity Within a Uniform System*, 56 Baylor L. Rev. 1, 29–46 (2004)). As Professor Beal further notes, the Texas APA differs from its federal counterpart in making "rules" that "interpret" law or policy—the so-called "interpretive rules"—subject to notice-and-comment rulemaking requirements. Ronald L. Beal, *Texas Administrative Practice & Procedure*, § 2.3.4 (2014) (citing 5 U.S.C. § 553(b)(3)(a)).

[49] *See El Paso Hosp. Dist.*, 247 S.W.3d at 714–15.

[50] *See Witcher*, 2014 WL 5654255, at *10.

[51] *See Sunset Transp.*, 357 S.W.3d at 700–01.

[52] *See id*. at 704. The portions of the notice at issue consisted of (1) a statement that "[a]ll motor carriers must maintain active insurance filing with TxDOT at all times;" and (2) a statement that motor carriers whose state registrations have been revoked "are required to re-register and submit applicable fees." The first challenged statement, we observed, "tracks TxDOT's rules" requiring motor carriers to "file and maintain proof of automobile liability insurance for all vehicles required to be registered." *Id*. (quoting 43 Tex. Admin. Code § 218.16(e)(1)(A)). The second challenged statement, we concluded, "tracks TxDOT's rules providing that '[i]f a motor carrier that has registered [under the statute requiring it] does not maintain continuous motor carrier registration

18

mere restatement of a formally promulgated rule from a statement that is itself a 'rule," was "straightforward" on the record presented there, but "might prove more elusive in other circumstances."[53]

The parties urge diametrically opposing views as to where TMB's letter lies along this continuum. Teladoc argues that the "construction" of Rule 190.8(1)(L)(i)(II) pronounced in TMB's letter amounts to an amendment of that formally promulgated rule, similar to the temporal cut-off in *El Paso Hospital*. It reasons that Rule 190.8(1)(L)(i)(II)'s requirement of ". . . acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing" denotes a non-exclusive list of illustrative examples of "acceptable medical practices," emphasizing dictionary definitions to that effect.[54] Consequently, Teladoc urges, Rule 190.8(1)(L)(i)(II) contemplates that a "physical examination" (whether "face-to-face" or through some other means) is merely one type of "acceptable medical procedure" through which a physician might permissibly make an initial diagnosis in a given case consistent with the standard of care. In pronouncing that a physical examination—and, indeed, each of the

---

under [the statute], the motor carrier must file an application under [the statute] to operate on public streets and highways in this state." *Id*. (citing 43 Tex. Admin. Code § 218.14(c) and related rule governing registration requirements and fees, § 218.13).

[53] *Id*.

[54] *See, e.g.*, *The American Heritage Dictionary of the English Language* 1740 (5th ed. 2011) (defining "such" as "[o]f this kind" and "[o]f a kind specified or implied," and describing the idiom "such as" to mean "[f]or example"); *see also Martinez v. Harris Cnty.*, 808 S.W.2d 257, 259 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (holding that list of activities after "such as" was illustrative only and not exclusive); *Board of Adjustment v. Levinson*, 244 S.W.2d 281, 282–283 (Tex. Civ. App.—San Antonio 1951, no writ) ("The synonyms of 'such as,' are alike, similar, of the like kind; 'such' representing the object as already particularized in terms which are not mentioned, being a descriptive and relative word, referring to the specific articles mentioned.").

19

other examples of "acceptable medical procedures" mentioned in Rule 190.8(1)(L)(i)(II) or their equivalent—are *all required* in *every* case, TMB's letter, in Teladoc's view, departs from that rule's unambiguous text to an extent as to effectively rewrite it.

In contrast, TMB insists that its letter merely "restates" Rule 190.8(1)(L)(i)(II), emphasizing two textual features of that enactment. First, pointing to the conjunction "and" within the rule's enumeration of ". . . acceptable medical practices such as patient history, mental status examination, physical examination, *and* appropriate diagnostic and laboratory testing," TMB urges that "such as . . ." must refer to all four of the cited procedures *collectively* as the exemplar of "acceptable medical practices." Second, TMB insists that the concluding sentence in Rule 190.8(1)(L)(i)(II)—"An online or telephonic evaluation by questionnaire is inadequate"—unequivocally bars physicians from relying only on a telephone consultation when establishing a physician-patient relationship. Teladoc counters that in the context of Rule 190.8(1)(L)(i)(II)'s use of "and" following "such as," "and" is merely the equivalent of "or," as suggested by Webster's use of the following example to illustrate the definition of "such as"—"course fish *such as* carp, catfish, and the like."[55] Were TMB's view of the rule correct, Teladoc suggests, it would imply that "course fish such as . . . " in the Webster's illustration must refer to a conflation of "carp, catfish, and the like" that is unknown to nature, a nonsensical construction. As for Rule 190.8(1)(L)(i)(II)'s last sentence, Teladoc accuses TMB of rewriting the rule again by ignoring the modifier ". . . online or telephonic evaluation *by questionnaire* . . ." "By questionnaire," Teladoc observes, denotes the use of a script or finite list of questions that are asked

---

[55] *Webster's Third New Int'l Dictionary* 2283 (2002) (defining "such").

without regard to the person being questioned.[56]  Evaluation or consultation without the use of a questionnaire—such as the sorts of open-ended questions that a doctor in search of a diagnosis might ask, whether in person or over the phone—are not prohibited, Teladoc urges.

TMB also insists that Rule 190.8(1)(L)(i)(II) must be read "in context" with its 2010 telemedicine rules.  By this, TMB means that the two enactments must be construed to impose parallel requirements of a "face-to-face" physical examination as part of a physician's initial evaluation of a new patient.  Were it otherwise, TMB reasons, physicians could "evade" the face-to-face physical examination requirements imposed by the telemedicine rules "simply by picking up the telephone and calling the patient."[57]  Teladoc replies that if the 2010 telemedicine rules have any bearing on the meaning of the 2003-enacted Rule 190.8(1)(L)(i)(II), it is only to illustrate stark textual differences between the two rules, most notably the contrast between Rule 174.8's reference to " . . . acceptable medical practices, *including* patient history, mental status examination, physical

---

[56]  *See, e.g.*, *American Heritage* at 1444 (defining "questionnaire" as "[a] form containing a set of questions, especially one addressed to a statistically significant number of subjects as a way of gathering information for a survey").

[57]  To similar effect, citing its responses to a comment from Teladoc regarding the proposed 2010 telemedicine rules, TMB emphasizes an excerpt in which it described Rule 174.8 as "consistent with and mirror[ing] the language of 22 TAC § 190.8(1)(L)."  35 Tex. Reg. 9085, 9090 (2010) (comment to adopted rule 22 Tex. Admin. Code § 174.8).  This statement responded to a comment concerning a requirement within Rule 174.8 regarding follow-up care and, in context, would appear to refer solely to that feature of the two enactments, not the broader correlation TMB insinuates. *See id*. Regardless, TMB's characterization of the relationship between the telemedicine rules and the preexisting Rule 190.8(1)(L)(i)(II) would be no more authoritative regarding the latter provision's meaning than the similar ex-post assertions contained in its June 2011 letter. *Cf. Entertainment Publ'ns*, 292 S.W.3d at 717–18 (noting Comptroller's Office's attempt to portray new tax code interpretation as one it "has consistently held").

examination . . . and appropriate diagnostic and laboratory testing"[58] as compared to Rule 190.8(1)(L)(i)(II)'s ". . . acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing."[59] "Including," Teladoc urges, is a term of enlargement that encompasses all that follows,[60] in contrast to the list of examples denoted by "such as." Such textual distinctions, as Teladoc emphasizes, must be given effect when construing Rule 190.8(1)(L)(i)(II).[61]

At bottom, Teladoc argues, TMB's letter amounts to a procedurally invalid amendment to conform Rule 190.8(1)(L)(i)(II) to Rule 174.8 merely by declaring that the two textually contrasting provisions actually mean the same thing. In that regard, Teladoc also emphasizes that when promulgating the current version of Rule 174.8 referring to " . . . acceptable medical practices, *including* patient history, mental status examination, physical examination . . . and appropriate diagnostic and laboratory testing" in 2010, TMB actually replaced a prior version that had contained language parallel to Rule 190.8(1)(L)(i)(II) and referring to " . . . acceptable medical practices *such as* patient history, mental status examination, and appropriate diagnostic and

---

[58] 22 Tex. Admin. Code § 174.8(a)(2) (emphasis added).

[59] *Id*. § 190.8(1)(L)(i)(II) (emphasis added).

[60] *See* Tex. Gov't Code § 311.005(13) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

[61] *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011) ("When the legislature uses a word or phrase in one portion of a statute but excludes it from another, the term should not be implied where it has been excluded."); *see also TGS-NOPEC*, 340 S.W.3d at 439 (we presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully).

laboratory testing."[62]  This history, Teladoc contends, betrays not only TMB's understanding of the significant difference in the meaning of "including" versus "such as," but its awareness that a change between the two must properly be achieved through the APA's notice-and-comment rulemaking processes and not by the naked fiat it relies on here.

We agree with Teladoc that TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text of Rule 190.8(1)(L)(i)(II), effectively substituting "including" for "such as," thereby conforming it to the 2010 telemedicine rules.  Similarly, to the extent the pronouncement also rests upon Rule 190.8(1)(L)(i)(II)'s last sentence, TMB's letter effectively deleted the modifying phrase "by questionnaire."  TMB's pronouncements hardly "track" Rule 190.8(1)(L)(i)(II) in the manner of the TxDOT notice in *Sunset Transportation*—rather, they depart from and effectively change that text.[63]

In contending otherwise, TMB ultimately insists that even if Rule 190.8(1)(L)(i)(II) fails to unambiguously support its "interpretation," the letter is at least consistent with a reasonable interpretation to which that ambiguous rule would be susceptible and would be accorded deference under the principles that govern judicial review of agency rule constructions.[64]  But even if we assume TMB's pronouncement could somehow be reconciled with Rule 190.8(1)(L)(i)(II)'s text,

---

[62]  *See* 35 Tex. Reg. 9085 (2010) (codified at 22 Tex. Admin. Code § 174.8) (proposed Apr. 30, 2010); 29 Tex. Reg. 6088, 6089 (codified at 22 Tex. Admin. Code § 174.4 (Use of the Internet in Medical Practice) (proposed Apr. 23, 2004), *repealed* 35 Tex. Reg. 9085 (2010) (emphasis added).  An earlier version of the same rule, promulgated in 2003, had also contained the same "such as" language. *See* 28 Tex. Reg. 3325 (2003) (codified at 22 Tex. Admin. Code § 174.17 (Use of the Internet in Medical Practice), *repealed* 29 Tex. Reg. 6088 (2004).

[63]  *Cf. Sunset Transp., Inc.*, 357 S.W.3d at 704; *Salazar*, 304 S.W.3d at 904.

[64]  *See, e.g.*, *TGS-NOPEC*, 340 S.W.3d at 438.

23

as the agency insists, the letter would still have the effect of amending the rule so as to adopt one of the alternative reasonable constructions to which the current text would be susceptible while rejecting another. To that extent, at least, the pronouncement would have a legal effect on private parties beyond that achieved through the text of Rule 190.8(1)(L)(i)(II) alone. To hold that the pronouncement has no such effect because it "interprets" or "applies" Rule 190.8(1)(L)(i)(II) to resolve an ambiguity would be, as previously suggested, logically inconsistent with the Legislature's explicit recognition that a "rule" under the APA includes an "agency statement of general applicability that . . . interprets . . . law."[65]

---

[65] *See* Tex. Gov't Code § 2001.003(6)(A). To the extent *Texas Mutual Insurance Co. v. Vista Community Medical Center Hospital*, 275 S.W.3d 538 (Tex. App.—Austin 2008, pet. denied), could be construed as holding to the contrary, we conclude it is not controlling. *Vista* concerned disputes arising under a formal rule promulgated by the Division of Workers' Compensation that had imposed a "stop-loss" limitation on reimbursement payments made to hospitals. After administrative law judges (ALJs) at the State Office of Administrative Hearings (SOAH) reached divergent conclusions regarding the proper construction of the stop-loss rule in deciding medical-reimbursement disputes, the director of SOAH's medical-review division prepared a one-page memorandum advocating what the director viewed as the proper construction of the rule, which SOAH ALJs followed for a period thereafter. *See id*. at 545–46. In relevant part, this Court held that the memorandum was not itself a "rule" void for failure to comply with APA rulemaking requirements. *See id*. at 555–56. The Court reasoned in part that the memorandum was not a "state agency statement" because it had never been adopted or approved by the relevant agency, the Division. *See id*. at 555. The Court went on, however, to conclude that the memorandum was merely a statement regarding SOAH's "internal management" that "did not affect private rights" because "it [was] designed to correct [ALJ's] inconsistent application or the Stop-Loss Exception" and "it did not change or amend [the stop-loss rule]; it simply mandated internal consistency when applying the rule." *Id*. at 556. *Vista*'s assertion that this memorandum was purely "internal" and had no impact on private rights is arguably inconsistent with both *El Paso Hospital* and this Court's more recent jurisprudence like *Entertainment Publications* and *Witcher*, inasmuch as the rule construction advocated in the memorandum was to be applied, and was applied, by SOAH ALJs in deciding medical fee disputes, plainly impacting private rights. *Cf. El Paso Hosp. Dist.*, 247 S.W.3d at 714–15 (agency's cut-off date affected hospitals' private rights); *Witcher*, 2014 WL 5654255, at *7 (emphasizing general applicability of the agency interpretation and its impact on the private rights); *Entertainment Publ'ns*, 292 S.W.3d at 721 (noting that applying interpretation to all

24

Finally, TMB urges that "sound public policy" warrants a narrow construction of the APA's "rule" definition that would exclude the pronouncements in its letter. "If this type of letter constitutes a 'rule,'" TMB insists, the "alternatives left to an agency . . . that wishes to alert a regulated entity that it [in the agency's opinion] is violating a statute or regulation" would be confined to the following "poor option[s]": (1) "without warning, simply initiate administrative proceedings"; (2) "send correspondence stating that the entity is violating a rule but without providing any additional explanation," leaving the entity to "merely guess at the basis for the alleged violation"; or (3) "initiate rulemaking proceedings each time it wants to notify a regulated entity of a possible violation." The latter option is especially odious in TMB's view, quoting the following familiar excerpt from this Court's 1999 *Brinkley* opinion, seemingly cited by this state's administrative agencies with greater frequency and fervor than even the Texas Constitution:

> Agencies would be reduced to impotence . . . if bound to express their views as to 'law,' 'policy,' and procedural 'requirements' through contested-case hearings or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the [L]egislature. . . . If every expression by the agency as to 'law,' 'policy,' and procedural 'requirements' requires the promulgation of a formal rule, the agency could no longer exercise its 'informed discretion' to choose adjudication as a means of making law and policy rather than rulemaking, a

---

brochure-fundraising firms affected private rights). Similarly, as for the suggestion that the memorandum did not impact private rights because it represented one of two competing constructions of the stop-loss rule, *Vista* cites no supporting authority beyond attempting to contrast the memorandum with the cut-off "rule" in *El Paso Hospital*, which it characterized as "contradict[ing]" the underlying formal rules. *See Vista*, 275 S.W.3d at 556. But leaving aside the merits of these assertions by the *Vista* Court, *see Sunset Transp.*, 357 S.W.3d at 704 (citing *Vista* as example where the distinction between "a mere restatement of a formally promulgated rule" and "a statement that is itself a 'rule'" was "elusive"), they can be classified as dicta given the Court's preceding holding that the memorandum was not a "state agency statement" at all. *See id.* at 555.

25

choice we have repeatedly said an agency has when it possesses both adjudicatory and rulemaking powers.[66]

An agency's discretion to "mak[e] 'law' or 'policy'" through adjudication is not unlimited, of course, as this Court has most recently held in *Witcher*,[67] but the more critical observation here is that our construction of the APA's "rule" definition does not imply the stark alternatives *Brinkley* and TMB suggest. As the Texas Supreme Court observed in *Leeper*, "Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review,"[68] and the Act defines "rule" in a way that will exclude a considerable range of unofficial, individually directed, tentative or other non-proscriptive agency or staff issuances concerning law or policy.[69]

But where, as here, an agency's legal or policy pronouncements seek to control the conduct of a free people through the assertion or threatened assertion of State power, agency "impotence" is hardly the relevant concern under our Constitution and laws. Rather, it is the risk that agencies—whose legitimate authority and very existence must derive from law and not merely

---

[66] *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.).

[67] *See Witcher*, 2014 WL 5654255, at *12–13 (discussing principles that limit ad hoc rulemaking).

[68] *Leeper*, 893 S.W.2d at 443.

[69] *See* Tex. Gov't Code § 2001.003(6); *Combs*, 311 at 100–01 (noting that appellees could not point to any specific "statement" by the comptroller); *see also* Ronald L. Beal, *Texas Administrative Practice & Procedure* § 2.3.4 (2014) (illustrating examples of agency statements that would fall short of "rules").

perceived "expediency"[70]—will stray from their legal limitations (perhaps with the best of individual intentions, but exceeding them nevertheless) through what federal courts have aptly termed a "tyranny of small decisions" that substantively assert Executive or Legislative power over the citizenry through forms calculated to avoid the meaningful checks and balances the Framers intended the Judiciary to provide.[71]  In very recently rejecting agency claims to an absolute right to supersede adverse trial court judgments pending appeal, the Texas Supreme Court cited similar concerns:

> The State's position—boundless entitlement to supersede adverse non-money judgments—would vest unchecked power in the executive branch, at considerable expense to the judicial branch, not to mention the wider public we both serve.  The Texas Constitution divides governing power among three branches, and power seized by one branch necessarily means power ceded by another.  Our State Constitution, like Madison's Federal handiwork, is infused with Newtonian genius:  three rival branches locked in synchronous orbit by competing interests—ambition checking ambition.  These are abstract principles, but they have real-world ripple effects on the lives of everyday Texans.  This case is Exhibit A.  TRAP 24.2(a)(3) gives the trial court discretion, quite sensibly, to prevent the State from re-revoking Montalvo's certification—the ultimate professional sanction—while it spends years appealing the court's reversal of the State's first revocation, something the trial court found "arbitrary and capricious."  The State—as yet unsupported by a victory on the merits in any court—wants to strip Montalvo of his livelihood while the appellate process grinds on . . . .  That's a striking assertion of unbridled executive power—to enforce

---

[70] *See, e.g.*, *Public Util. Comm'n v. City Pub. Servs. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001) ("[W]hen the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its functions or duties.  An agency may not, however, exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes.").

[71] *See Iowa League of Cities v. Environmental Prot. Agency*, 711 F.3d 844, 873 (8th Cir. 2013) (quoting *Professionals & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596 (5th Cir. 1995)).

administrative orders that a trial court has reversed—and TRAP 24.2(a)(3) recognizes the judiciary's authority to say no.[72]

With similar perceptiveness, the Legislature, through the APA, has enabled affected citizens to invoke judicial jurisdiction, through section 2001.038, to test the "validity" or "applicability" of agency pronouncements that rise to the level of "rules"—including those that "interpret" law or policy—and required that the further checks of transparency, public participation, and reasoned justification must precede such assertions of agency authority. We must give effect to these important safeguards, as the Legislature has intended.

---

[72] *In re State Bd. for Educator Certification*, No. 13-0537, 2014 Tex. LEXIS 1208, at *17–18 (Tex. Dec. 19, 2014); *see* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."); *see also City of Dallas v. Stewart*, 361 S.W.3d 562, 577 (Tex. 2012) (citing approvingly to scholarship suggesting that administrative agencies, in assuming adjudicatory, rulemaking, and administrative functions in a manner not obviously contemplated by the tripartite constitutional structure, suffer from a "chronic 'legitimacy crisis'" (citing Richard H. Fallon, Jr., *Legitimacy and the Constitution*, 118 Harv. L. Rev. 1787, 1842–43 (2005)).

To the extent TMB argues that its letter resembles those that *Brinkley* held to be "simply advisory guidelines" that "have no legal effect on private persons," *see Brinkley*, 986 S.W.2d at 770-71 & nn. 9 & 10, we observe that *Brinkley*'s analysis was premised on the view that agency pronouncements of law have no material effect on private rights unless issued in the form of formal rules or contested-case orders. *Id*. at 769. That premise has been eroded, to say the least, by this Court's precedents that have been informed by the Texas Supreme Court's intervening *El Paso Hospital* decision. In short, if *Brinkley* would imply a different result here, we need go no farther than to conclude it is distinguishable.

28

We hold that TMB's pronouncements regarding Rule 190.8(1)(L)(i)(II) contained in its June 2011 letter are a "rule" as a matter of law. Accordingly, we sustain Teladoc's first issue and need not reach its second issue, which it argues in the alternative.[73]

## CONCLUSION

Having sustained Teladoc's first issue on appeal, we reverse the district court's judgment and render summary judgment declaring that TMB's pronouncements regarding Rule 190.8(1)(L)(i)(II) contained in its June 2011 letter are a "rule" under the APA and, therefore, invalid under section 2001.035 of that Act.

_____
Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Field

Reversed and Rendered

Filed:   December 31, 2014

---

[73] *See* Tex. R. App. P. 47.1.