# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30568

United States Court of Appeals
Fifth Circuit

**FILED**

May 6, 2014

Lyle W. Cayce
Clerk

MARUCCI SPORTS, L.L.C.,

Plaintiff-Appellant,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; THE NATIONAL FEDERATION OF STATE HIGH SCHOOL ASSOCIATIONS,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana

Before STEWART, Chief Judge, and GARZA and SOUTHWICK, Circuit Judges.

CARL E. STEWART, Chief Judge:

Plaintiff-Appellant challenges the district court's dismissal of its antitrust suit against Defendants-Appellees. Marucci Sports ("Marucci"), a baseball bat manufacturer, filed suit against the National Collegiate Athletic Association ("NCAA") and the National Federation of State High School Associations ("NFHS") alleging that the NCAA and NFHS imposed a regulation that restrains trade in the market for non-wood baseball bats in violation of the Sherman Act and other state laws. More specifically, Marucci alleged that the Bat-Ball Coefficient of Restitution Standard ("BBCOR Standard") was designed to protect the NCAA's interest in receiving

sponsorship money from larger bat manufacturers such as Rawlings, Easton, DeMarini, and Louisville Slugger ("Incumbent Manufacturers") and exclude new market entrants like Marucci. The NCAA and NFHS moved to dismiss the complaint and the district court granted their motions.[1] Marucci appeals the dismissal of its Sherman Act claim and the denial of its motion to amend its Second Amended Complaint.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Marucci is a fairly new baseball bat manufacturer located in Baton Rouge, Louisiana. The NCAA and NFHS are unincorporated associations that regulate the organized athletic activities of their member institutions—colleges and universities and public/private high schools, respectively. In 2011, the NCAA and NFHS implemented the BBCOR Standard to regulate the performance of non-wood baseball bats used in high school and collegiate baseball games. The BBCOR Standard is a measurement of how "hot" a bat is, or in other words, how fast a ball comes off the bat on contact. The higher the score, the "hotter" the bat. According to the NCAA, the purpose of the BBCOR Standard is to ensure that aluminum and composite bats perform like wood bats in an effort to enhance player safety and reduce technology-driven homeruns and other big hits.

WSU conducts all BBCOR certification testing. The testing procedure involves firing a baseball at a subject bat and measuring, *inter alia*, the ball's speed as it leaves the bat. The measurements are used to generate a BBCOR value. Bats with a BBCOR value of 0.500 or less are certified for use in NCAA and NFHS-governed baseball games. The BBCOR protocol includes an audit

---

[1] Washington State University ("WSU") was initially named as a defendant but was dismissed from the case as well. Marucci did not appeal the judgment dismissing WSU. However, for reasons discussed more fully *infra*, WSU's role in this case remains relevant.

[2] Marucci did not appeal the district court's dismissal of its state law claims.

provision that allows for periodic testing of previously certified bat models. A bat model may be decertified if three different bats of the same length and weight combination have failed compliance testing. The BBCOR protocol allows bat manufacturers to observe compliance testing and to appeal a finding that a certain bat is non-compliant. Between 2010 and 2011, Marucci had several aluminum bat models certified as compliant with the BBCOR Standard. In early 2012, four of Marucci's bats failed compliance testing because their BBCOR value exceeded 0.500. In April 2012, WSU retested Marucci's decertified bats and they failed again. Marucci appealed WSU's findings to the NCAA Baseball Rules Committee and the decision to decertify the bats was affirmed.

On April 18, 2012, Marucci filed suit against the NCAA, NFHS, and WSU. In May 2012, the NCAA, NFHS, and WSU filed separate motions to dismiss Marucci's complaint. In lieu of responding to the motions to dismiss, Marucci filed its First Amended Complaint on May 15, 2012. Defendants then moved to dismiss the First Amended Complaint. Marucci responded to the motions to dismiss and also filed its Second Amended Complaint. The NCAA and NFHS then moved to dismiss the Second Amended Complaint. On March 8, 2013, Marucci filed a motion to amend its Second Amended Complaint and attached a copy of its proposed Third Supplemental & Amending Complaint ("Third Amended Complaint").[3] On March 25, 2013, the district court granted Defendants' motions to dismiss the Second Amended Complaint. The district court also denied Marucci's motion to amend its Second Amended Complaint.

---

[3] Marucci filed an additional "Third Supplemental & Amending Complaint" on April 23, 2013. For the purposes of this opinion, we consider the factual allegations contained in both documents together and refer to them collectively as the "Third Amended Complaint."

No. 13-30568

On appeal, Marucci claims that the district court erred in dismissing its Sherman Act claim and abused its discretion by denying Marucci's motion to amend its Second Amended Complaint.

## II. DISCUSSION

### A. Marucci's Sherman Act Claim

#### 1. Standard of Review

"We review a district court's ruling on a motion to dismiss de novo." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010) (citation omitted). In order to survive a motion to dismiss, the pleader must submit a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Antitrust claims do not necessitate a higher pleading standard and a plaintiff "need only plead 'enough facts to state a claim to relief that is plausible on its face.'" *Wampler*, 597 F.3d at 744 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).

#### 2. Applicable Law

15 U.S.C. § 1 ("the Sherman Act") prohibits all agreements that restrain trade. *See Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 342 (1982). To establish a violation of § 1 of the Sherman Act, Marucci must demonstrate that: "(1) [the NCAA and NFHS] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002).

To satisfy the conspiracy element of a Sherman Act claim, Marucci must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "Once a plaintiff establishes that a conspiracy occurred, whether it

4

violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Id.* (citation omitted). "[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) ("*Leegin I")* (citations omitted). Moreover, the *per se* rule should only be applied when "conduct [is] so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001) (citation omitted).

Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition. *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 343. The court's considerations should include the restrictive practice's "history, nature, and effect" and "[w]hether the businesses involved have market power." *Leegin I*, 551 U.S. at 885–86 (citation and internal quotation marks omitted). Market power has been defined as "the ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984) (citations omitted). The rule of reason analysis also requires that the plaintiff show that the defendants' activities injured competition. *PSKS, Inc. v. Leegin Creative Leather Prods.*, 615 F.3d 412, 417 (5th Cir. 2010) *("Leegin II").* The rule of reason is designed to help courts differentiate between "restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin I*, 551 U.S. at 886. Regardless of which rule applies, the court's inquiry should ultimately focus upon "form[ing] a judgment about the competitive significance

of the restraint." *Bd. of Regents*, 468 U.S. at 103 (citation and internal quotation marks omitted).

In *Board of Regents*, the Supreme Court explained that "it is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive . . . ." *Id.* at 117. The Court distinguished between the restraints at issue in that case —limitations on football telecasts—and "rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture." *Id.* The latter are presumptively procompetitive and are not generally deemed unlawful restraints on trade. *See id.*

### 3. Analysis

#### a. Conspiracy

We must first decide whether the Second Amended Complaint sufficiently alleges that the NCAA and NFHS engaged in concerted action— that is, a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co.*, 465 U.S. at 764 (citation and internal quotation marks omitted). Whether the NCAA and NFHS worked in concert with other parties to establish and enforce the BBCOR Standard is uncontroversial. That much is clear. The pivotal question is whether the concerted action was a result of an agreement between the NCAA, NFHS, and others to unreasonably restrain trade. For reasons explained below, we conclude that the Second Amended Complaint fails to sufficiently allege that the NCAA and NFHS conspired to restrain trade in the non-wood baseball bat market.

Marucci's Second Amended Complaint posits, without further detail, that the NCAA and NFHS "have engaged in a conspiracy" which "consist[ed]

of an understanding and concert of action among the defendants to enforce the BBCOR Standard with the purpose and effect of excluding new entrants and insulating [the Incumbent] Manufacturers from competition in a relevant market." The Second Amended Complaint does not, however, allege any specific *facts* demonstrating an intention on the part of the NCAA, NFHS, WSU, the Incumbent Manufacturers, or any other party to engage in a conspiracy. *See Broyles v. Wilson*, 3 F.3d 439, \*4 (5th Cir. 1993) (unpublished) (affirming dismissal where complaint contained no specific facts showing that the defendant and his alleged co-conspirators intended to join a conspiracy); *see also Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1159 (5th Cir. 1992) (holding that plaintiff's pleadings were sufficient because in addition to simply alleging that a conspiracy existed, the complaint indicated that the defendants met and collectively agreed on a method of manipulating the relevant market). Marucci's allegations do not make it plausible that the NCAA and NFHS adopted a conscious commitment to a common scheme designed to achieve an unlawful objective. In other words, the Second Amended Complaint does not set forth facts that demonstrate a "meeting of the minds" between the NCAA, NFHS, and other alleged conspirators. *See Twombly*, 550 U.S. at 557. Much like the plaintiff in *Twombly*, Marucci failed to present any "independent allegation of actual agreement" among the alleged conspirators. *See id.* at 564. Instead, the Second Amended Complaint presents various conclusory allegations that support one of many inferential possibilities. The Supreme Court instructs that such a complaint falls short of the requirements of Rule 8(a)(2). *See id.* at 557. Accordingly, we conclude that Marucci failed to sufficiently allege a conspiracy under § 1 of the Sherman Act.

No. 13-30568

## b. Restraint on Trade that Injures Competition

Additionally, to survive a motion to dismiss for failure to state a claim, Marucci's Second Amended Complaint must allege facts showing that the BBCOR Standard unreasonably restrained trade in the aluminum and composite baseball bat market. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) (stating that "Section 1 applies only to concerted action that restrains trade"); *Tunica Web Adver. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 412 (5th Cir. 2007); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 289 (5th Cir. 1988) (stating that only "*unreasonable* restraint[s]" are actionable under § 1 (citation omitted)). Accepting all of the Second Amended Complaint's factual allegations as true, we conclude that it fails to demonstrate that the BBCOR Standard injures competition in the market for non-wood baseball bats.

The BBCOR Standard is best described as a "rule[] defining the conditions of the contest" as explained in *Board of Regents*, 468 U.S. at 117.[4] In that case, the Supreme Court provided examples of rules or conditions that regulate athletic competitions between the NCAA's member institutions such as "the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed . . . ." *Id.* at 101. The liveliness of a baseball bat falls squarely within the framework of the rules and

[4] For purposes of context, *Board of Regents* involved a challenge by two of the NCAA's member institutions to the NCAA's regulation of television broadcasts of college football games. *Id.* at 91–92. For years, the NCAA exercised complete control over college football's television policy. *Id.* Eventually, the College Football Association ("CFA"), an organization composed of major collegiate football programs and conferences, decided that they should have a larger voice with respect to college football's television policy. *Id.* at 94. Accordingly, the CFA signed an agreement with a television network that would allow more appearances for each institution and thereby increase their revenue streams. *Id.* at 95. In response, the NCAA announced that it would discipline any institution that complied with the CFA's agreement. *Id.* Two institutions filed suit against the NCAA alleging a Sherman Act violation. *Id.* at 88.

conditions described in *Board of Regents*.  The Court noted that it agreed with the NCAA's argument that "maintaining a competitive balance among amateur athletic teams is legitimate and important."  *Id.* at 117.  The Court also explained that "[i]t is reasonable to assume that most of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and therefore procompetitive because they enhance public interest in intercollegiate athletics."  *Id.*  We are inclined to apply the same presumption to the BBCOR Standard.

The Second Amended Complaint's assertions regarding market injury are completely speculative.  We have stated that "[s]peculation about anticompetitive effects is not enough."  *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994).  Marucci must allege facts that show that the BBCOR Standard actually harmed competition among non-wood baseball bat manufacturers.  *See id.*  The Second Amended Complaint makes no such showing.  The crux of the Second Amended Complaint is that the NCAA and NFHS's enforcement of the BBCOR Standard harms Marucci and other unnamed "market entrants" by favoring large manufacturing companies.  Marucci's predominate focus on its own injury is misguided because antitrust laws are designed to protect competition, not competitors.  *See Jebaco, Inc. v. Harrah's Operating Co.,* 587 F.3d 314, 320 (5th Cir. 2009); *Cargill v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 (1986). Accordingly, relief is not available for Marucci because the only plausible injury it asserts is its own.  Only injuries to the market are cognizable.

### c. Other Rule of Reason Considerations

Under a rule of reason analysis, we balance the BBCOR Standard's "anticompetitive evils" with its "procompetitive benefits."  *See Coca-Cola Enters., Inc.*, 300 F.3d at 627 (citation and internal quotation marks omitted).  Marruci alleges that the BBCOR Standard has several anticompetitive

features: (1) the BBCOR Standard does not regulate bat performance; (2) it does not increase price competition; and (3) it does not improve the quality of products. These allegations are all conclusory assertions that we are not obligated to accept as true.

Furthermore, despite Marucci's frequent references to "new market entrants," the Second Amended Complaint fails to provide the identity of the "new market entrants" or demonstrate when and how the BBCOR Standard has been arbitrarily and unfairly applied to their products.[5] Nonetheless, Marucci was very specific in its allegations with respect to its own bat models. It is telling that even though the Second Amended Complaint includes detailed information regarding the certification and eventual decertification of Marucci's bats, no similar information was included with respect to other "new market entrants." As it stands, the allegations before the panel demonstrate that four of Marucci's bats were decertified; this likely had a very minimal, if any, effect on the market. We also note that not all of Marucci's bats were decertified. According to the Second Amended Complaint, Marucci still had seven bat models that were certified for use in NCAA and NFHS competition after opening day in 2012. As emphasized by the district court, the fact that some of Marucci's products are excluded, alone, is not enough to state a claim under § 1 of the Sherman Act.

A restraint should not be deemed unlawful, even if it eliminates a competitor from the market, so long as sufficient competitors remain to ensure that competitive prices, quality, and service persist. *See Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("Of course, conduct that

---

[5] Marucci's repeated overtures regarding the alleged conspiracy to discriminate against small manufacturers in favor of large manufacturers is unpersuasive in the context of an antitrust claim. We explained in *Jebaco, Inc.*, that antitrust laws are not designed to protect small businesses from larger ones. 587 F.3d at 320. Instead, antitrust laws are designed to promote competition, regardless of the size of the business. *See id.*

eliminates rivals reduces competition.  But reduction of competition does not invoke the Sherman Act until it harms consumer welfare.") (citations omitted). Numerous other BBCOR-certified bats are available for use in NCAA and NFHS baseball games.  Marucci alleged no factual information about other competitors dropping out of the market, significant price changes, or diminution in the quality of bats.  Accordingly, the BBCOR Standard's anticompetitive evils, pursuant to the information in the Second Amended Complaint, are virtually non-existent.

Viewing the facts alleged in the Second Amended Complaint as true, we conclude that the regulation at issue is a rule defining the conditions of the contest that is entitled to a procompetitive presumption.  We are not permitted to, nor are we inclined to accept Marucci's conclusory assertion—that the BBCOR Standard was created and implemented to protect the Incumbent Manufacturers—as true.  Accordingly, we hold that Marucci did not state a claim upon which relief could be granted and the district court properly dismissed its Sherman Act claim.

## B.  Marucci's Motion to Amend its Second Amended Complaint

We now turn to Marucci's argument that it should have been granted a third opportunity to remedy the defects of its complaint.  Marucci filed, and the district court granted, two motions to amend its complaint.  Marucci later moved to amend its complaint for a third time.  The district court denied this motion without providing reasons for the denial.  Marucci argues that the district court erred by denying its motion to amend its Second Amended Complaint.

### 1.  Standard of Review

The district court's denial of Marucci's motion to amend is reviewed for abuse of discretion.  *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003).

11

### 2. Applicable Law

"Rule 15(a) requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 994 (5th Cir. 2005) (citation and internal quotation marks omitted). Leave to amend is in no way automatic, but the district court must possess a "substantial reason" to deny a party's request for leave to amend. *Id.* (citation and internal quotation marks omitted). The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." *Id.* (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

Denying a motion to amend is not an abuse of discretion if allowing an amendment would be futile. *Briggs v. Miss.*, 331 F.3d 499, 508 (5th Cir. 2003). An amendment is futile if it would fail to survive a Rule 12(b)(6) motion. *Id.* Therefore, we review the proposed amended complaint under "the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000) (citation internal and quotation marks omitted).

No. 13-30568

## 3. Analysis

The district court afforded Marucci two opportunities to amend its complaint.  These amendments did not cure what is likely incurable—Marucci's inability to allege sufficient facts showing that the BBCOR Standard injures competition in the non-wood bat market.  However, this court has expressly stated that motions to amend should be freely granted and that a district court's failure to explain its reasons for denying the motion typically warrants reversal.  Nevertheless, because our review is for abuse of discretion, and because Marucci was granted two opportunities to amend, we conclude that the district court did not abuse its discretion by denying Marucci's motion to amend.  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006) ("Plaintiffs had three attempts to produce a sufficient complaint.  The [district] court dismissed the complaint and denied leave to amend only after the third insufficient attempt."); *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 (5th Cir. 2002) (holding that it was not an abuse of discretion to deny plaintiffs a third opportunity to sufficiently state a claim).

We recognize that the district court did not follow the preferred course of explaining its reasons for denying the motion to amend.  Nevertheless, the record reflects ample and obvious grounds for the denial.  After allowing Marucci three opportunities to state a claim upon which relief could be granted, the district court was satisfied that the defects in the complaint could not be cured.  We are similarly persuaded and conclude that granting Marucci's motion to amend would have been futile.  *See Stripling*, 234 F.3d at 873 (stating that the district court has discretion to deny motions to amend if they are futile).  We have explained that an amended complaint is futile if it fails to state a claim upon which relief may be granted.  *See id.*  Marucci's proposed Third Amended Complaint does not state a colorable claim under § 1 of the

13

No. 13-30568

Sherman Act. The Third Amended Complaint provides insufficient factual information to demonstrate that there was a meeting of the minds between the NCAA, NFHS, and other alleged coconspirators. It also fails to demonstrate that the BBCOR Standard injures the relevant market. Instead, the Third Amended Complaint simply provides more specific details about how the BBCOR Standard is enforced to the detriment of small manufacturers like Marucci. Because two prior amendments were granted and allowing a third would have been futile, we conclude that the district court did not abuse its discretion by denying Marucci's motion to amend.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of the Second Amended Complaint and AFFIRM the district court's denial of Marucci's motion to amend.