**TELADOC, INC., et al., Plaintiffs,**

v.

**TEXAS MEDICAL BOARD, et al., Defendants.**

**No. 1–15–CV–343 RP.**

United States District Court, W.D. Texas, Austin Division.

Signed May 29, 2015.

---

Drew Navikas, George Cary, Leah Brannon, Cleary Gottlieb Steen & Hamilton, LLP, Washington, DC, Dudley D. McCalla, Joshua A. Romero, Matt Dow, Jackson Walker, LLP, Austin, TX, for Plaintiffs.

James Carlton Todd, Office of the Attorney General, Austin, TX, for Defendants.

## *ORDER*

ROBERT L. PITMAN, District Judge.

Before the Court are Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction Before June 3, 2015 and Brief in Support, filed April 29, 2015 (Clerk's Dkt. # 10), the responsive pleadings thereto, as well as Amicus briefs filed both in support of, and opposition to, Plaintiffs' application. The Court conduct-

ed a hearing on the application on May 22, 2015. Having considered the application, response, record in the case, and the applicable law, the Court is of the opinion that Plaintiff's application for a preliminary injunction should be granted. See FED. R. CIV. P. 65(b).

## I. BACKGROUND

Plaintiffs Teladoc, Inc. and Teladoc Physicians, P.A. (jointly "Teladoc"), Kyon Hood, M.D., and Emmette Clark, M.D. bring this action against defendants the Texas Medical Board ("TMB"), and fourteen members of the TMB in their official and individual capacities[1] challenging recent regulatory changes adopted by the TMB.

The TMB is a state agency "statutorily empowered to regulate the practice of medicine in Texas." 22 TEX. ADMIN. CODE § 161.1. Teladoc describes itself as providing "telehealth services," utilizing telecommunication technologies to provide health care services outside the traditional models wherein medical professionals provides services in an in-person office or hospital setting. According to Plaintiffs, "[t]elehealth providers are generally available 24 hours per day, 365 days per year, for a fraction of the cost of a visit to a physician's office, urgent care center, or hospital emergency room." (Compl. ¶ 3).

Teladoc's services are typically available to individuals whose employer has contracted with Teladoc for a per-member subscription fee. Individuals register with Teladoc either by telephone or online, creating a personal account, including information such as a medical history, physician, contact information, and medi-

cal records. Registrants may also upload photographs and medical records to Teladoc's system for inclusion with their medical history. (Id. ¶¶ 43–44).

Registrants seeking a physician consultation can log into Teladoc's web portal or call a toll-free number to place a request for consultation. Teladoc employs board certified physicians who are provided specialized training in treatment and diagnosis via telephone. Once a Teladoc physician accepts the request for consultation, the physician reviews the requesting registrant's information and medical records through the website, then calls the registrant by telephone and consults with him or her. Based on the medical records and history, reported symptoms, and other information the physician elicits during the consultation, the physician dispenses medical advice, including referring the registrant to a physician's office, dentist, or emergency room. When deemed appropriate, the physician can prescribe certain medications.[2] Following the consultation, the Teladoc physician enters notes and findings into the registrant's record, which is available to the registrant and, if the registrant chooses, is forwarded to his or her primary-care physician. (Id. ¶¶ 45, 68–71, 76–84).

This action relates to the TMB's adoption on April 10, 2015 of revisions to Chapter 190 of the Texas Administrative Code title which governs the TMB. Chapter 190 sets forth disciplinary guidelines for the practice of medicine in Texas. 22 TEX. ADMIN. CODE § 190.1. Plaintiffs specifically complain of the revisions to section 190.8(1)(L) ("New Rule 190.8") which sets

---

1. The members of the TMB have not yet made an appearance in their individual capacities. Only the TMB and its members in their official capacities filed a response to the application for a preliminary injunction. The Court refers herein to both the TMB and its members in their official capacities as the TMB.

2. According to Teladoc, its physicians do not prescribe "DEA-controlled substances (including narcotics) or what are referred to as lifestyle drugs (i.e., Viagra, or diet pills)." (Compl. ¶ 81).

forth practices the TMB deems to be violations of the Texas Medical Practices Act.

As originally adopted by the TMB in 2003, section 190.8(1)(L) ("Old Rule 190.8") prohibits prescription of any "dangerous drug or controlled substance" without first establishing a "proper professional relationship" which requires, in pertinent part, "establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing." 22 TEX. ADMIN. CODE § 190.8(1)(L). New Rule 190.8 prohibits prescription of any "dangerous drug or controlled substance" without first establishing a "defined physician-patient relationship" which "must include," in pertinent part, "documenting and performing" a "physical examination that must be performed by either a face-to-face visit or in-person evaluation" elsewhere defined as requiring the provider and patient to be in the same physical location or at an established medical site. (Def. Resp. Ex. 15).

In 2004 the TMB adopted regulations specifically governing "telemedicine." 22 TEX. ADMIN. CODE §§ 174.1 et seq. Effective October 2010, the TMB amended its telemedicine regulations, restricting the definition of "telemedicine" to consultations using "advanced telecommunications technology that allows the distant site provider to see and hear the patient in real time." 22 TEX. ADMIN. CODE § 174.2. The amended regulations also made clear that, to establish a "proper physician-patient relationship," telemedicine providers were required to conduct a physical examination of a patient. Id. § 174.8.

In June 2011, the TMB issued a letter to Teladoc, stating the language of Old Rule 190.8 required a "face-to-face" examination prior to prescription of a dangerous drug or controlled substance. The letter makes clear the TMB considered Teladoc and its physicians to be engaging in a prohibited practice by issuing prescriptions following telephone-only consultation. (Plf. Appl. Ex. 1 ("Navikas Decl.") Ex. A).

Teladoc sought legal recourse by bringing suit against the TMB in Texas state court. The court of appeals held the "TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text," finding the TMB had effectively substituted "including" for the actual "such as" phrase. Teladoc, Inc. v. Texas Med. Bd., 453 S.W.3d 606, 620 (Tex. App.-Austin 2014, pet. filed). Thus, the court found the "TMB's pronouncements hardly 'track' [Old] Rule 190.8 … rather, they depart from and effectively change that text," rendering the June 2011 letter a procedurally invalid amendment to Old Rule 190.8. Id.

In response, the TMB issued an "emergency" rule on January 16, 2015, amending Old Rule 190.8. The emergency amendment mandated a "face-to-face visit or in-person evaluation" before a physician can issue a prescription. (Compl. ¶ 111). Teladoc sought and obtained a temporary injunction of the emergency rule in Texas state court. (Navikas Decl. Ex. U). The TMB then engaged in a formal rulemaking, resulting in an April 10, 2015 vote by the TMB to adopt New Rule 190.8. (Navikas Decl. Ex. B).

Plaintiffs filed this action on April 29, 2015, asserting Defendants have committed a violation of antitrust law, as well as the Commerce Clause of the Constitution in adopting New Rule 190.8. Plaintiffs now seek a preliminary injunction preventing enforcement of New Rule 190.8, which is to go into effect on June 3, 2015. The parties have filed responsive pleadings. The Court conducted a hearing on May 22, 2015 and the matter is now ripe for review.

## II. STANDARD OF REVIEW

■ A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is, to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir.1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales*, 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985).

## III. ANALYSIS

### A. Likelihood of Success

■ Plaintiffs contend they are likely to succeed on the merits both of their antitrust claim as well as their claim under the Commerce Clause. To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir.2013). *See also Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir.2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed.1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")).

### 1. Antitrust

■ This case presents an atypical situation under antitrust laws. States are generally permitted to regulate their economies in ways they see fit, including "impos[ing] restrictions on occupations, confer[ring] exclusive or shared rights to dominate a market, or otherwise limit[ing] competition to achieve public objectives." *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, —— U.S. ——, 135 S.Ct. 1101, 1109, 191 L.Ed.2d 35 (2015). Thus, in most situations "federal antitrust laws are subject to supersession by state regulatory programs." *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 632, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992). As a result, the Supreme Court has "interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity." *Id.* at 1110 (citing *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 87 L.Ed. 315 (1942)). Specifically, state regulation is granted *Parker* immune from antitrust law where the challenged restraint is "clearly articulated and affirmatively expressed as state policy" and is "actively supervised by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Alum., Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

Significantly, in this case, the TMB declined to assert any immunity defenses, including *Parker* immunity, solely as to Plaintiffs' application for a preliminary injunction. The normal deference afforded to a state under antitrust law is, therefore, not an issue in reviewing Plaintiff's application for a preliminary injunction. The Court's opinion is properly read through that narrow, and unusual, lens.

### a. Governing Law

█ Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade ... is declared to be illegal." 15 U.S.C. § 1. Thus, to establish a violation of Section 1 of the Sherman Act, "plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir.2015). More particularly, Section 1 prohibits concerted action which unreasonably restrained trade in the relevant market. *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010) ("Section 1 applies only to concerted action that restrains trade"); *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir.2014) (plaintiffs must allege facts showing defendants "unreasonably restrained trade" in market); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 289 (5th Cir.1988) (only "unreasonable restraint[s]" violate Section 1). For the purpose of Plaintiffs' request for immediate injunctive relief, the TMB does not contest the existence of a conspiracy. Rather, it maintains Plaintiffs cannot demonstrate the requisite anti-competitive effect.

█ To seek relief for anti-competitive conduct, a plaintiff must show both an injury to the plaintiff as well as an "antitrust injury." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318–19 (5th Cir.2009) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir.1997)). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Put another way, a plaintiff "must show that the defendants' activities caused an injury to competition." *Doctor's Hosp.*, 123 F.3d at 307. *See also Felder's Collision Parts, Inc. v. All Star Adver. Agency, Inc.*, 777 F.3d 756, 757 (5th Cir.2015) ("It would not be an antitrust opinion without the line that the antitrust laws were designed for the protection of competition, not competitors") (internal quotation omitted).

█ Assessing whether an injury to competition has occurred utilizes a sliding scale of analysis. *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 373 (4th Cir.2013), *aff'd*, —— U.S. ——, 135 S.Ct. 1101, 191 L.Ed.2d 35 (2015). At one end of the scale are practices considered anti-competitive per se. *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 362 (5th Cir.2008). At the other end of the scale, restraints are analyzed under the "rule of reason." which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Id.* (quoting *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)). Courts apply a middle ground called "quick look" analysis only "when the great likelihood of anticompetitive effects can easily be ascertained," and "after assessing and rejecting [the] logic of proffered procompetitive justifications." *Id.* (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770–71, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999)).

### b. Discussion

The parties in this case disagree which analysis the Court should apply. Plaintiffs maintain the quick-look analysis is warranted, while the TMB argues the rule of reason should be applied. This dispute need not be addressed as the Court con-

cludes Plaintiffs' challenge succeeds under both analyses.

■ Plaintiffs maintain the effect of New Rule 190.8 will be increased prices, reduced choice, reduced access, reduced innovation, and a reduced overall supply of physician services. As the TMB itself concedes, the types of harm identified by Plaintiffs are clearly "the kind of injuries that the antitrust laws were enacted to prevent." (Def. Resp. at 4 (quoting *Nilavar v. Mercy Health Sys.-W. Ohio*, 494 F.Supp.2d 604, 617 (S.D.Ohio 2005))). However, the TMB argues Plaintiffs have presented only speculation, not concrete data, which shows the identified injuries are actually likely to occur should New Rule 190.8 go into effect.

The Court disagrees. Plaintiffs' evidence shows the average costs of visits to a physician or emergency room are $145 and $1957, respectively, and the cost for a Teladoc consultation is typically $40. (Plf. Appl. Ex. 8 ("Miller Decl.") ¶ 69). Plaintiffs also cite to research finding companies using Teladoc's services achieved reduced monthly employee healthcare costs. (Miller Decl. ¶ 70). Additionally, Plaintiffs present evidence that patients choose telehealth for a number of reasons, including reduced travel and waiting time. (Plf. App. Ex. 3 ("DePhillips Decl.") ¶ 52; Ex. 5 ("Hood Decl.") ¶ 14. Ex. 7 ("Smythe Decl.) ¶ 28). One physician stated that, without Teladoc, some of his patients would have gone without treatment. (Hood Decl. ¶ 14). Another suggested access to telehealth would reduce delay in obtaining treatment. (Smythe Decl. ¶ 24).

Plaintiffs have also cited evidence that Teladoc increases opportunities for physicians to provide health care. One physician testified telehealth allowed him to continue to practice medicine on a flexible schedule in his semiretirement. (Plf. Appl. Ex. 6 ("Clark Decl.") ¶¶ 15–16). Another testified, without telehealth, he would treat fewer patients. (Hood Decl. ¶ 8). This evidence is significant in light of the evidence presented by Plaintiffs that Texas suffers from a shortage of doctors, particularly in rural areas, and that approximately 50% of Teladoc's client patients do not have a regular physician. (Hood. Decl. ¶ 11; Smythe Decl. ¶ 26; DePhillips Decl. ¶ 18). Elimination of physicians providing healthcare would thus negatively impact not just the competitor physicians, but consumers, a classic antitrust injury.

The Court finally notes the TMB's own evidence supports Plaintiffs' contention that Teladoc provides benefits to the market. As one physician stated, "one cannot help but realize the care [Teladoc is] attempting to deliver decreases the costs for insurance companies and large employers that are self insured." (Def. Resp. Ex. 5 ("Curran Aff.") at 3). In addition, a study conducted in California concluded "Teladoc appears to be expanding access to patients who are not connected to other providers." (Def. Resp. Ex. 22 ("RAND study") at 1). Accordingly, the Court concludes Plaintiffs have presented sufficient evidence, at this preliminary stage, to meet their burden to show an anti-competitive effect by New Rule 190.8. *See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1305 (11th Cir.2010) ("higher premiums and decreased choices [are] two evils within the ambit of the antitrust laws.").

■ The Court thus turns to the second part of the analysis, balancing the anti-competitive effect of the challenged regulation with the pro-competitive justification offered in support. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir.2010) (under rule of reason court balances "anticompetitive evils" of challenged regulation "against any procompetitive benefits or justifications"); *Specialty Physicians*, 528 F.3d at 362 (to justify quick-look analysis,

the burden remains on challenger to demonstrate proffered procompetitive effect does not result in net procompetitive effect). The sole justification the TMB offers is that New Rule 190.8 will lead to improved quality of medical care. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 841 (11th Cir.2015) (noting cognizable procompetitive justifications include improving product quality or service). *See also Marucci Sports*, 751 F.3d at 377 (addressing failure to improve quality as anticompetitive evil).

As an threshold matter, the Court notes all physicians licensed by Texas, including Teladoc physicians, are bound to the same standard of care and ethical rules. *See* 22 TEX. ADMIN. CODE § 190.8(1)(A) ("Failure to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the [Medical Practices] Act includes, but is not limited to ... failure to treat a patient according to the generally accepted standard of care."). As Plaintiffs point out, Teladoc physicians refer patients who cannot be diagnosed reasonably and safely via the telephone to an in-person physician. (DePhillips Decl. ¶ 25). As the TMB itself makes clear, it has the authority to, and regularly does, investigate complaints against physicians who do not meet the standards of care for practicing in Texas. In light of the existing restrictions on poor quality care, the Court finds TMB's assertion of additional improvement in the quality of care by the adoption of New Rule 190.8 suspect.

In support of this contention the TMB first cites to affidavit testimony presented by medical practitioners detailing deficiencies in telephone-only diagnosis. (Def. Resp. Ex. 3 ("Malone Aff") (noting complaint of left shoulder pain without acute injury cannot be diagnosed without face to face encounter with patient); Ex. 4 ("Douglass Aff.") (relating example of mis-treatment by Teladoc physician of ear pain with antibiotic ear drops, where correct diagnosis of sinus infection was only made following physical exam); Curran Aff. at 3 (relating two examples where physical examination aided in diagnosis); Ex. 12 ("Yount Aff") (noting two examples of "poor care" provided via telephone contact). As Plaintiffs point out, this testimony is essentially anecdotal, reflecting the opinion of the affiants, but not necessarily statistically reliable evidentiary studies. *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380–81 (5th Cir.2010) (finding testimony based on "anecdotal evidence" did not meet threshold for admission of expert testimony under *Daubert* standard). Moreover, to the degree anecdotal evidence is informative, Plaintiffs have submitted countervailing testimony from patients extolling the value of Teladoc's services. (DePhillips Decl. ¶¶ 33–36 (detailing examples of positive results of Teladoc services); Ex. 10 ("Stowell Decl.") Ex. B (describing incident in which Teladoc physician identified early stages of heart attack and directed patient to immediately go to emergency room, stating "I would definitely not have done this if I did not call Teladoc because I did not understand the severity of the situation.").

It is also worth noting Plaintiffs have submitted expert testimony summarizing pertinent research, and concluding "there is empirical evidence suggesting widespread improper antibiotic prescribing by physicians following in-person physical examination." (Plf. Reply Ex. 2 ("Mehrotra Decl.") ¶ 45).

The TMB also suggests notes made by a regular treating physician, in contrast with a Teladoc consulting physician, become "part of the patient's permanent medical record, which will follow her to future locations and can be accessed by future treating personnel." (Def. Resp. at 11). As

the TMB acknowledges, however, Teladoc permits patients to send their Teladoc record to their primary care physician, although apparently only roughly one-third agree to do so. (*Id.*). Moreover, in reality, patients do not have a singular "permanent medical record." Rather, patients have records scattered across a variety of providers. (Mehrotra Decl. ¶¶ 52–53).

Plaintiffs further contend the TMB's contention of increased quality of care is rebutted by the continued acceptance of "on call" coverage by one physician for another's patients. The TMB maintains the service provided by Teladoc is not comparable, relying on affidavit testimony in which physicians describe on call coverage as based on a shared practice, in which physicians have a common knowledge of skills and values, as well as access to the patient's medical record. (Curran Aff. at 2; Def. Resp. Ex. 9 ("Arambula Aff.")). As noted above, Plaintiffs have presented evidence rebutting the notion that a patient has a singular record. The Court additionally notes that, while the TMB's evidence suggests an on call physician has access to patient records, it does not establish the on call physician checks those records before treating a patient. Indeed, one physician has testified that, as an on call physician, he had no access to electronic medical records, and would rely on the patient's account of symptoms and medical history. (Clark Decl. ¶ 5).

Further, affidavit testimony provided by Plaintiffs indicates there may not be empirical evidence supporting the distinction between Teladoc's service and that of an on call physician. (Mehrotra Decl. ¶ 51). Additionally, affidavit testimony from a Texas physician notes that physician assistants in Texas may enter into agreements with supervising doctors delegating prescription writing authority. Under such an agreement, the physician assistant may issue a prescription without examining the patient, by listening to the patient's descriptions of his or her symptoms over the phone. (Smythe Decl. ¶ 25).

Finally, and troublingly, the TMB cites a study performed in California, assessing use of Teladoc by a large public employer. In its proffered justification for adopting New Rule 190.8, the TMB stated that "[t]he study found:

Teladoc's model could actually further fragment healthcare;

Teladoc's physicians are unable to use visual cues to aid in diagnosis;

The limitations of telephone only consult could lead to misdiagnosis and higher rates of follow-up care-findings that have already been demonstrated with e-visits and telephone consultations;

The adult users of Teladoc, in the study, were younger and healthier and lived in more affluent communities; and

The population of patients attracted to Teladoc—a more affluent and likely more technologically savvy group—might have fewer access needs than people living in area's [sic] characterized by shortage of primary care or socio-economic disadvantage. And further research is needed to understand whether Teladoc might be improving access for patients with lower income and those in rural areas, and if not, can it be positioned to do so in the future.

(Def. Resp. Ex. 11 ("Freshour Aff.") Ex. (c) at 12).

Plaintiffs, in turn, have provided the affidavit of one of the two researchers who conducted the study, Ateev Mehrotra ("Mehrotra"). According to Mehrotra, the TMB has mischaracterized his research by "present[ing] to the Court a number of conclusions that are purportedly drawn from my 2014 study that are not accurate descriptions of my findings" but rather

"hypotheses laid out in the introduction of the study." (Mehrotra Decl. ¶ 24).

Mehrotra specifically takes exception to the statement that his study "found" that Teladoc consultations "could lead to misdiagnosis and higher need for follow-up visits." (*Id.* ¶ 25). Instead, he states the "data showed that, across the three leading conditions treated by Teladoc, 13% of visits to physicians' offices and 20% of visits to the emergency room led to follow-up care, whereas only 6% of Teladoc calls led to follow-up care," results which "do not support the hypothesis that Teladoc has higher rates of misdiagnosis or mismanagement." (*Id.* ¶ 26).

In fact, the first page of the study, which is attached to the TMB's response to Plaintiffs' application, summarized the study as showing "Patients who uses Teladoc were less likely to have a follow-up visit to any setting, compared to those patients who visited a physician's office or emergency department." (RAND Study at 1). Plaintiffs also cite a second research study examining the impact of Teladoc on employees for Home Depot. In pertinent part, the researchers concluded "Teladoc users had significantly lower rates of follow-up office visits, ER visits, and hospitalizations at both 7 and 30 days." (Plf. Appl. Ex. 2 ("Gorevic Decl.") Ex. A at 15). In sum, Plaintiffs have presented significant evidence which undermines the TMB's contention that the quality of medical care will be improved by New Rule 190.8.

The TMB suggests Plaintiffs' countervailing evidence is an insufficient basis for enjoining New Rule 190.8. The TMB points to the Supreme Court's statement that "certain practices by members of a learned profession might survive scrutiny under the Rule of Reason even though they would be viewed as a violation of the Sherman Act in another context." *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 686, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). *See also Goldfarb v. Va. State Bar,* 421 U.S. 773, 788 n. 17, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). While the decision does indeed include that quotation, in *Professional Engineers* the Supreme Court explicitly rejected the notion that improved public safety was a sufficient justification for a society of professionals to adopt an anti-competitive policy. *Prof'l Eng'rs,* 435 U.S. at 695, 98 S.Ct. 1355 (attempt to justify anti-competitive policy "on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal assault on the basic policy of the Sherman Act"). The Supreme Court has continued to reject such justifications. *See F.T.C. v. Indiana Fed'n of Dentists,* 476 U.S. 447, 463, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (rejecting argument "that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices" as justification for anti-competitive policy).[3]

The Court thus concludes Plaintiffs have presented evidence and argument which makes a prima facie showing they are likely to succeed on the merits of their claim under the Sherman Act.

---

3. The TMB also suggests the proper standard for reviewing its justification is whether its "conclusions are so baseless that no reasonable medical practitioner could have reached those conclusions after reviewing the same set of facts." *Willman v. Heartland Hosp. E.,* 34 F.3d 605, 611 (8th Cir.1994). At issue in *Willman,* however, was whether specific corrective action against a physician violated antitrust laws if the physician's peer reviewers had legitimate medical reasons to believe that the physician provided substandard care. TMB's reliance on *Willman* in this case is simply not appropriate.

## 2. Dormant Commerce Clause

Plaintiffs maintain New Rule 190.8 violates the Commerce Clause because it discriminates against physicians who are licensed in Texas, but are physically located out of state. The Supreme Court has made clear "[t]ime and again," that state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald,* 544 U.S. 460, 472, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). The TMB maintains Plaintiffs cannot establish more than "an indirect burden on interstate commerce" which does not violate the Commerce Clause. *Dickerson v. Bailey,* 336 F.3d 388, 396 (5th Cir.2003).

As the Court has concluded Plaintiffs have shown a likelihood of success on their antitrust claim, Plaintiffs have satisfied the first element of the test for grant of a preliminary injunction. The Court thus declines to address this claim.

## B. Substantial Threat of Irreparable Injury

As to the second element, Plaintiffs contend they face irreparable injury. First, the plaintiff physicians maintain they would no longer be able to engage in providing medical care under the Teladoc model. Although the parties do not directly address this issue, as noted above, both Plaintiff Hood and Clark have submitted declarations in support of the application for preliminary injunction. Hood, as a Virginia resident, testifies he would be unable to provide care to Texas residents were New Rule 190.8 to go into effect and would lose substantial income. (Hood Decl. ¶¶ 27–29). Clark testifies he is nearing retirement and anticipates earning income through Teladoc to support himself.

According to Clark, absent that income, he will have to delay his retirement. (Clark. Decl. ¶¶ 15–18).

Monetary losses are generally not considered to satisfy the irreparable injury required to obtain a preliminary injunction. *See Bluefield Water Ass'n, Inc. v. City of Starkville,* 577 F.3d 250, 253 (5th Cir.2009) (there is no irreparable injury where any harm is financial, and monetary compensation will make plaintiff whole if plaintiff prevails). *See also Heil Trailer Int'l Co. v. Kula,* 542 Fed.Appx. 329, 335 (5th Cir.2013) (irreparable injury is one that cannot be undone by monetary damages). However, Clark suggests money damages alone are insufficient to compensate him for delaying his requirement. (Clark. Decl. ¶ 18). Similarly, Hood would be forced to choose between continuing to practice in Virginia or moving to Texas. Finally, implementation of New Rule 190.8 would eliminate the possibility that Clark and Hood could continue to provide healthcare via telephone consultation, effectively rendering their current business practices impossible. As discussed more fully below, destruction of a business model may constitute irreparable injury.

As to the remaining plaintiffs, succinctly put, Teladoc maintains it would no longer be in business in Texas, or otherwise. Unquestionably, New Rule 190.8 would prevent Teladoc from providing its telephone-only service to patients in Texas. In 2014, 23% of Teladoc's revenue was generated by Texas consultations or service payments. (Gorevic Decl. ¶ 5). Teladoc contends deprivation of its ability to do business in Texas would destroy its business model, causing "harm for which there is no adequate remedy at law." *Daniels,* 710 F.3d at 585. At least two circuit courts have recognized destruction of a business model may constitute irreparable injury. *See Stuller, Inc. v. Steak N Shake Enters.,*

*Inc.*, 695 F.3d 676, 680 (7th Cir.2012) (evidence that change in pricing policy would be significant change to business model, negatively affecting revenue, and that re-establishing previous business model without loss of goodwill and reputation would be difficult, met threshold for irreparable injury); *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18–19 (1st Cir.1996) (evidence defendant's product was integral component of plaintiff's business model, customers relied on availability of product, and product line served as "a beacon to attract potential customers," sufficed to show potential loss of consumer goodwill and threat of irreparable injury).

The TMB contends Plaintiffs' claims that they will no longer be able to provide healthcare services in Texas is overblown for two reasons. First, they maintain Plaintiffs have not shown they cannot continue to do business in Texas by utilizing the provisions in the TMB's regulations permitting telemedicine through the use of video equipment.

The Court notes, however, those regulations require "the use of advanced telecommunications technology that allows the distant site provider to *see and hear* the patient in *real time*." 22 Tex. Admin. Code § 174.2(10) (emphasis added). Under the regulations, a patient presents at an "established medical site," which must be staffed with a licensed health care provider, and then communicates with the distant health care professional via real time video. *Id.* § 174.2(2) & (7). The site must have "sufficient technology and medical equipment to allow for adequate physical evaluation, as appropriate for the patient's presenting complaint." *Id.* 174.2(2). The current regulations provide that a "patient's private home is not considered an established medical site." *Id.* However, the regulations have recently been amended to permit a patient's home to be considered an established medical site if the

home has "sufficient communication and remote medical diagnostic technology to allow the physician to carry out an adequate physical examination appropriate for the patient's presenting condition while seeing and hearing the patient in real time." (Def. Resp. Ex. 13). In short, these regulations do not permit Teladoc to simply substitute video technology for its current telephone consultation model.

Moreover, the president of Teladoc testifies since 2011 Teladoc has explored operating by way of establishing remote medical sites in Texas, but has concluded the associated costs would prevent it from competing and would prevent it from serving a diffusely located patient population. (Plf. Reply Ex. 2 ("Gorevic Supp. Decl.") ¶ 15). Teladoc also considered partnering with physicians and employers in Texas to provides services at their offices, as well as sending physicians to specific sites at specific times, but rejected both options for the same reasons of cost and diffusely located patients. (Gorevic Supp. Decl. ¶¶ 16–17).

Second, Defendants point out Teladoc has clients in states other than Texas. However, as noted above, Plaintiffs have presented evidence that nearly one-quarter of their business is generated in Texas. Plaintiffs have also presented evidence that its subscribers include multi-state employers who demand healthcare services be available in all states. (Gorevic Decl. ¶ 18; Murphy Decl. App. C).

Additionally, Plaintiffs correctly point out an irreparable injury includes one for which monetary damages would be "especially difficult to calculate." *Heil Trailer*, 542 Fed.Appx. at 335. According to Teladoc's statistics, it has experienced rapid growth, quadrupling its revenues between 2012 and 2014. (Gorevic Supp. Decl. Ex. C–I). Teladoc's evidence further suggests the telehealth industry as a whole

is at an early stage, making future growth especially difficult to estimate. (Gorevic Decl. ¶ 20; Murphy Decl. ¶ 44)..

Teladoc further maintains it is at an especially vulnerable point in its growth. Teladoc characterizes itself as a young business, dependent on ongoing funding from new sources to maintain and grow its business. (Gorevic Decl. ¶ 22). Further, Teladoc is planning·an initial public offering of common stock. Teladoc's president states Teladoc's investment bankers have advised that the stock offering will not go forward if New Rule 190.8 is put into effect. (Gorevic Decl. ¶ 14; Gorevic Supp. Decl. ¶¶ 8–9). Teladoc additionally points out some of its physicians, the quality of which are key to patient satisfaction and Teladoc's continued viability, are declining to continue to provide services through Teladoc. (DePhillips Decl. Ex. C; Murphy Decl. App. at 22–24).

Finally, Plaintiffs argue they face irreparable injury because, even if monetary compensation was sufficient, it is unlikely they will be able to recover monetary damages from the defendants. According to Teladoc, Plaintiffs' trebled antitrust damages would run into at least the tens of millions of dollars and likely outstrip the individual defendants' ability to pay. (Murphy Decl. ¶¶ 31–36). The Fifth Circuit recently noted the district court did not abuse its discretion in considering there was a "substantial probability that [plaintiff] would be unable to collect a judgment against [defendant]" in finding the plaintiff faced irreparable harm. *Aspen Tech., Inc. v. M3 Tech., Inc.,* 569 Fed.Appx. 259, 273 (5th Cir.2014). *See also Specialty Healthcare Mgmt., Inc. v. St. Mary Parish Hosp.,* 220 F.3d 650, 658 (5th Cir.2000) (noting there is some authority for proposition that inability to actually collect on money judgment may suffice to make injury irreparable). The possibility that the TMB will assert immunity from monetary damages as a state agency also weighs in favor of finding Plaintiffs face irreparable harm. *See Crowe & Dunlevy, P.C. v. Stidham,* 640 F.3d 1140, 1157 (10th Cir.2011) (imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury); *Harris v. Cantu,* 81 F.Supp.3d 566, 580, 2015 WL 338938, at *11 (S.D.Tex. Jan. 26, 2015) (where defendants entitled to Eleventh Amendment immunity from money damages, plaintiff "has suffered and—if no injunction is issued—will continue to suffer irreparable injury for which money damages are inadequate").

The Court thus finds Plaintiffs have shown they face a substantial threat of irreparable injury.

## C. Balancing of Respective Interests

The final two prongs of the preliminary injunction inquiry require weighing of the respective interests of the parties and the public. Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and that the injunction will not disserve the public interest. In this case, the inquiry essentially collapses because the interests asserted by the TMB are in the form of protecting the public from injury.

The TMB contends Plaintiffs have failed to meet their burden to show the harm they would suffer if New Rule 190.8 were permitted to take effect does not outweigh the threat to public safety the rule poses. The TMB characterizes Plaintiffs' evidence of harm as merely "speculative." As discussed above, however, Plaintiffs have presented specific evidence detailing the financial harm they will suffer, likely including destruction of Teladoc's business model and ability to do business in Texas, in addition to other non-monetary harms.

Plaintiffs have also presented evidence casting into doubt their ability to receive monetary damages, even if such damages were sufficient to compensate them for the injury suffered.

As to the threat to public safety and health, the TMB has presented only anecdotal evidence of possible public harm. As reviewed above, Plaintiffs have presented countervailing anecdotal evidence, as well as evidence suggesting the basis for TMB's conclusions concerning Teladoc are poorly founded. In addition, Plaintiffs have presented evidence that consumers will face higher prices for medical care, as well as reduced access.

Finally, Plaintiffs point out a Texas state court considered this very issue in February in considering whether to enjoin enforcement of the emergency rule adopted by the TMB in January 2015. That court concluded "No imminent peril to public health, safety or welfare existed on January 16, 2015, or exists at the present time to justify adoption of the emergency rule." (Navikas Decl. Ex. U ¶ 2). At the injunction hearing, Plaintiffs suggested this ruling should be viewed as collaterally estopping the TMB from asserting otherwise in this action. While the Court declines to adopt Plaintiffs' view, the ruling additionally weighs against the TMB's arguments.

In light of the evidence presented by Plaintiffs, the Court concludes the balance of respective interests of the parties and the public weigh in favor of granting Plaintiffs' application for a preliminary injunction.

## IV. CONCLUSION

Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction Before June 3, 2015 (Clerk's Dkt. # 10) is hereby **GRANTED.**

Accordingly, it is hereby **ORDERED** that New Rule 190.8 is enjoined from taking effect and Defendants are enjoined from taking any action to implement, enact and enforce New Rule 190.8 from taking effect pending final resolution of the claims brought by Plaintiffs in their Complaint.