# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 23, 2025

Lyle W. Cayce
Clerk

No. 23-20617

———————

Brittany Salinas; Nelda Cordova Salinas,

*Plaintiffs—Appellants*,

*versus*

City of Houston; Officer M. Salazar; Officer N. Garcia,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:22-CV-4120

———————————————————

Before Elrod, *Chief Judge*, Higginbotham, and Southwick, *Circuit Judges*.

Patrick E. Higginbotham, *Circuit Judge*:

Houston police officers Manual Salazar and Nestor Garcia, members of the Gang Division Crime Reduction Unit, fatally shot David Anthony Salinas on July 14, 2021, following a pursuit in a sting operation. His widow Brittany Salinas brings this suit against Officers Salazar and Garcia and the City of Houston, asserting claims under 42 U.S.C. § 1983, the Texas Tort Claims Act, and the state-created danger theory of constitutional liability.

No. 23-20617

The district court granted Defendants' motion to dismiss in full. We AFFIRM.

## I.

The facts described below are based on Plaintiff-Appellants' Second-Amended Complaint and attached exhibits, which include body-worn camera ("BWC") footage from Officers Garcia and Salazar, and the Affidavit of Jason De La Cruz, a friend of David Salinas.[1]

In the early evening of July 14, 2021, Houston Police Officers Manuel Salazar and Nestor Garcia (collectively, "the Officers") were on patrol when they received a dispatch call with vehicle information, including vehicle type and plate number.[2] At this time, David Anthony Salinas ("Salinas") was going home after stopping at a gas station and was on the phone with his friend, Jason De La Cruz. Upon locating the vehicle, a Nissan, the Officers turned on their lights.[3] When Salinas did not pull over for 20 seconds, a high-speed chase ensued, ending when Salinas crashed into a cement pillar of a

_____

[1] The district court, in its November 2023 memorandum opinion and order, declined to consider BWC footage from the Officers' body cameras, stating: "The court may not look beyond the pleadings in ruling on a 12(b)(6) motion." But this Court has held that "on a motion to dismiss, the court is entitled to consider any exhibits attached to the complaint, including video evidence." *Beroid v. LaFleur*, No. 22-30489, 2023 WL 3034706, *5 (5th Cir. Apr. 21, 2023). *See also Villareal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016). Plaintiff-Appellants attached BWC footage from Officers Salazar and Garcia, as well as the Affidavit of De La Cruz, to their Second-Amended Complaint. We consider them all on appeal.

[2] BWC footage from Officer Salazar shows that the Officers received vehicle information. At 0:02:40 of the video, Officer Garcia asks: "What kind of car is it?" Officer Salazar responds: "It's … Frank X-Ray John. I think it's a Nissan. Check—I ran it I think."

[3] BWC footage from Officer Salazar at 0:03:59 shows the Officers saying: "Alright, we're lighting him up" before engaging their lights. At 0:04:07, the Officers say: "He's refusing to stop." At 0:04:14, the Officers repeat: "He's refusing to stop." At 0:04:21, the Officers say again that Salinas is "refusing to stop."

freeway underpass. The Nissan was disabled with significant front-end damage, a cracked windshield, and a deployed airbag.

The Officers parked their cruiser next to Salinas' driver-side door, preventing Salinas from exiting the car, jumped from the cruiser, and surrounded Salinas' car with their weapons drawn and pointed at Salinas. Salinas, at this point, appeared to be in the passenger seat. Officer Salazar stood by the driver-side door of Salinas' vehicle while Officer Garcia stood near the passenger-side door.

Officer Salazar shouted commands for Salinas to show his hands, yelling: "Let me see your hands! Let me see your hands! Let me see your hands! Hey! Hands! Hands! Hands! Hands! Let me see your hands!" Officer Garcia also shouted at Salinas: "Hey let me see your hands! Hands! Hands! Hands! Hands! Hands! Hands! Let me see your f--king hands! Hands! Let me see your hands!" Officer Garcia knocked on the windshield several times as he was shouting the commands. Officer Salazar then radioed in for assistance.

During this interaction, as Salinas moved around from side to side and raised and lowered his hands intermittently, Officer Salazar shouted: "Hey! Stop reaching! Stop reaching! Stop reaching!", and shouted to Officer Garcia: "Hey, watch the crossfire!" before again shouting at Salinas to "stop reaching." At the same time, Officer Garcia yelled: "He's reaching, he's reaching!" Officer Garcia then shouted at Salinas: "Let me see your hands! Stop reaching motherf--ker! Stop—your hands! Hands! Hands! Against the door! Against the door! Stop your f--king hands!"

Officer Salazar shouted at Salinas: "Hey! Let me see your hands! Hands! Hands! Hands! Hands! Hands! Keep them up! Keep them up!" When Salinas again began reaching, with his hands disappearing from the Officers' view, Officer Salazar shouted: "Keep—he's reaching! He's

3

reaching! Hey! He's reaching!" De La Cruz, who was still on the phone with Salinas at the time, stated that he heard Salinas telling the Officers: "Don't shoot, I am looking for my phone."

As Salinas appeared to reach for something behind the driver's seat of his vehicle, leaning over the center console, Officer Salazar took a few steps back before firing at Salinas. Officer Garcia similarly stepped back from the car and fired through the passenger-side of the windshield. The Officers fired 11-12 rounds at Salinas. At no point did the Officers see Salinas wield a gun. After firing, Officer Salazar radioed: "Shots fired. Shots fired," and reported the incident. When backup arrived, medical aid was rendered.

In sum, both Officers shouted multiple warnings at Salinas to comply before firing their weapons. In total, Officer Salazar yelled "show me your hands" or "hands" to Salinas at least fourteen times and shouted "stop reaching" to Salinas at least four times. Officer Garcia shouted "let me see your hands" or "hands" to Salinas at least fifteen times and yelled "stop reaching" or "he's reaching" at least three times. It signifies that from the moment the Officers jumped out of their cruiser to the first firing of shots, 38 seconds had elapsed.

## II.

Brittany Salinas ("Brittany") filed suit in June 2023, in the United States District Court of the Southern District of Texas,[4] asserting claims

---

[4] Nelda Córdova Salinas, Salinas' mother, and the Estate of David Anthony Salinas were also named plaintiffs in the complaint. After Defendant-Appellees jointly argued that Plaintiff-Appellants lacked standing to bring claims, the district court dismissed Nelda Córdova Salinas and the Estate of David Anthony Salinas from the suit. Because their dismissals are not challenged on appeal, these claims are forfeited, *see Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021), and Brittany Salinas is the only remaining Plaintiff-Appellant on appeal. We focus our analysis on Brittany Salinas and her claims.

No. 23-20617

against Officer Salazar, Officer Garcia, and the City of Houston under 42 U.S.C. § 1983, the Texas Tort Claims Act, and the state-created danger theory of constitutional liability.[5]

Defendants argued that Brittany lacked standing to bring her claims and moved to dismiss all claims under FED. R. CIV. P. 12(b)(6). Though the district court found that Brittany had standing, it ultimately granted the motion and dismissed Brittany's claims with prejudice, concluding that the Officers were entitled to qualified immunity, and the claims against Houston were meritless. Brittany timely appealed.

## III.

This Court reviews *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6),[6] accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff,[7] mindful that "the court is entitled to consider any exhibits attached to the complaint, including video evidence."[8] To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

---

[5] The claims before this court are made in Plaintiff-Appellant's Second-Amended Complaint. On appeal, Plaintiff-Appellants have forfeited their claims under the state-created danger theory, claims regarding the Officers' failure to render medical aid to Salinas, and their TTCA claims against the Officers because they do not raise them in their briefs. *See Rollins*, 8 F.4th at 397.

[6] *Butts v. Aultman*, 953 F.3d 353, 357 (5th Cir. 2020).

[7] *See Alexander v. City of Round Rock*, 854 F.3d 298, 303 (5th Cir. 2017).

[8] *Beroid*, No. 22-30489, 2023 WL 3034706 at*5. *See also Villareal*, 814 F.3d at 766. As mentioned in n.1, this Court is permitted to review the BWC footage of Officers Salazar and Garcia, despite the district court's declining to do so. This Court is also permitted to consider De La Cruz's affidavit.

No. 23-20617

plausible on its face."[9] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[10]

## IV.

On appeal, the City and the Officers continue to maintain that Brittany did not meet the demands of the Texas Survival Statute.[11] This Court, however, has made clear that "a party must have standing under the state wrongful death *or* survival statutes to bring [claims] under 42 U.S.C. [§ 1983]."[12] Brittany, as the surviving spouse of Salinas, has sufficiently pleaded facts to establish standing to sue under the Texas Wrongful Death Statute, which provides a cause of action for the benefit of the surviving spouse, children, and parents of the deceased.[13] As such, we find that Brittany has standing to bring her claims, and need not reach her standing under the Texas Survival Statute.[14]

---

[9] *Butts*, 953 F.3d at 357 (quoting *Masel v. Villarreal*, 924 F.3d 734, 743 (5th Cir. 2019)).

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[11] *See* TEX. CIV. PRAC. &. REM. CODE § 71.021(b).

[12] *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (emphasis added).

[13] The Texas Wrongful Death Statute provides "an action to recover damages as provided by this subchapter is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." TEX. CIV. PRAC. & REM. CODE § 71.004(a).

[14] This is not to infer that Brittany's standing lacks force under the Texas Survival Statute, which states that "[a] personal injury action survives to and in favor of the heirs, legal representatives, and estate of the injured person." TEX. CIV. PRAC. & REM. CODE § 71.021(b). The district court noted—and Brittany pleaded—that Brittany is the surviving spouse of Salinas and the Executrix (or Administrator) of the Estate of David Anthony Salinas. Brittany also included information about the probate court proceedings in her complaint, and we take judicial notice of the fact that Brittany was appointed as Administrator of the Estate of David Anthony Salinas in July 2022, *Estate of David Anthony*

No. 23-20617

## V.

As to the Officers, Brittany argues that the district court erred when it dismissed her § 1983 claims against Officers Salazar and Garcia, asserting that Salinas' Fourth Amendment rights were violated, and that his rights were clearly established. As we find no constitutional violation, we find no error and end our analysis here. The Officers are entitled to qualified immunity.

## A.

"Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[15] When reviewing a motion to dismiss based on the affirmative defense of qualified immunity, courts engage in a two-part inquiry "asking: first, whether taken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violate a constitutional right; and second, whether the right was clearly established."[16] And, "judges

---

*Salinas*, No.505036 (Prob. Ct. No. 2, Harris County, Tex. July 18, 2022), and took an Oath of Administratrix in September 2022, *Id.* at (Prob. Ct. No. 2, Harris County, Tex. September 21, 2022). *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."); *United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001) ("An appellate court may take judicial notice of facts, even if such facts were not noticed by the trial court."). *See also* FED. R. EVID. 201. Brittany has pleaded "sufficient factual matter" to prove standing under the Texas Survival Statute for her claims. *Butts*, 953 F.3d at 357 (citation omitted).

[15] *Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021) (cleaned up) (citation omitted).

[16] *Byrd v. Cornelius*, 52 F.4th 265, 271 (5th Cir. 2022). *See also Beroid*, No. 22-30489, 2023 WL 3034706, at *4 (applying qualified immunity analysis to a motion to dismiss).

of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."[17]

## B.

Brittany argues that Salinas' Fourth Amendment rights were violated, alleging an unlawful detention claim and an excessive force claim. We address each in turn, looking first at Brittany's unlawful detention claim. Specifically, she asserts that the Officers' attempted stop and subsequent pursuit of Salinas were unlawful detentions that violated Salinas' Fourth Amendment rights because the Officers lacked probable cause.

## 1.

"The Supreme Court has defined probable cause as the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"[18] The facts must be known to the officer at the time of the seizure, and must be particularized to the detainee.[19]

---

[17] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We note that the district court here skipped to the second prong of the two-part inquiry and held that the Officers were entitled to qualified immunity because Brittany Salinas did not sufficiently show that Salinas' allegedly violated rights were clearly established. Under *de novo* review, we affirm the district court but find that the Officers are entitled to qualified immunity under the first prong: Salinas did not suffer a constitutional injury.

[18] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (quoting *Piazza v. Mayne*, 217 F.3d 239, 245-46 (5th Cir. 2000)).

[19] *Id.*

But even in the absence of probable cause, "[t]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity may be afoot[.]"[20] Reasonable suspicion requires the consideration of the totality of the circumstances, and "must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion."[21] An officer must articulate something more than an "inchoate and unparticularized suspicion or hunch."[22]

**2.**

Brittany asserts that the Officers lacked probable cause to detain Salinas because he was not in violation of any known law at the time. She alleges that Salinas was driving home from the gas station when the police pursuit occurred, that he was "randomly selected for no apparent reason other than he was at the wrong place at the wrong time," that he was not a "fleeing" suspect,[23] and that BWC footage does not show that identifying information on Salinas was transmitted through radio dispatch.[24]

We find, however, that the Officers had—at the very least— reasonable suspicion to detain Salinas. Contrary to Brittany's assertions,

---

[20] *United States v. Neufeld-Neufeld*, 338 F.3d 374, 378 (5th Cir. 2003).

[21] *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (*en banc*).

[22] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (cleaned up).

[23] To support this argument, Brittany points to De La Cruz's Affidavit to assert that Salinas was not aware that he was being pursued by the Officers, and therefore was not fleeing. This assertion, however, cannot be considered by this Court because it is speculative. *Twombly*, 550 U.S. at 555.

[24] Relatedly, Brittany argues that there are "facts in the record casting doubt on whether a reasonable officer would have concluded that the man who crashed his car underneath the freeway overpass was the same one who the VICE division wanted for questioning."

BWC footage from Officer Salazar shows that the Officers had information on a vehicle partially matching Salinas and that they had previously run his license plate in their system, that Salinas did not pull over after the Officers engaged their lights, and that the Officers reported to dispatch multiple times that Salinas was "refusing to stop" over the course of 20 seconds.[25] And Brittany's pleadings further undermine her argument that Salinas was not "fleeing[,]" as Brittany admits that there was a police "pursuit" and a police "chase" of Salinas' car.

Taken together, these factors—the Officers' knowledge of identifying information on Salinas' vehicle, coupled with the context of a sting operation and Salinas' refusal to stop—provide sufficient "particular and articulable facts" to warrant reasonable suspicion.[26]

## C.

Brittany also raises an excessive force claim, arguing that the Officers used "unwarranted deadly force" when they shot and killed Salinas following the pursuit and crash of his vehicle. In doing so, she emphasizes De La Cruz's affidavit, asserting that the district court erred when it disregarded it and failed to give full weight to all available evidence.

## 1.

The Fourth Amendment "protects the right to be free from excessive force during a seizure. A violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force."[27] Assessing whether an officer's use

---

[25] *See supra* n.3.

[26] *Michelletti*, 13 F.3d at 840.

[27] *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).

No. 23-20617

of force was excessive is "necessarily [a] fact-intensive" endeavor that "depend[s] on the facts and circumstances of each particular case."[28] "In making this determination, a court should consider the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[29] These are the now twenty-seven-year-old *Graham* factors.[30]

Additionally, the reasonableness of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[31] A court's inquiry must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[32]

**2.**

Viewing the facts in the light most favorable to Brittany,[33] we find that she has not alleged a plausible claim of excessive force.[34] As we explained,

---

[28] *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012) (citation omitted).

[29] *Amador v. Vasquez*, 961 F.3d 721, 727-28 (5th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

[30] *Graham*, 490 U.S. at 396.

[31] *Amador*, 961 F.3d at 728.

[32] *Id.* (quoting *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir.), *cert. denied sub nom. City of Fort Worth v. Darden*, 139 S. Ct. 69, 202 L.Ed.2d 23 (2018)).

[33] *See Alexander*, 854 F.3d at 303.

[34] Applying the *Graham* factors to the case at hand, we note here that there are limited facts available to determine the severity of the crime here. As we find that the other two *Graham* factors weigh in favor of justifying the Officers' use of deadly force against Salinas, we focus our analysis there.

Salinas was "attempting to evade arrest by flight."[35] And, Brittany's pleadings and the Officers' BWC footage provide sufficient support for a reasonable officer's belief that Salinas posed an immediate threat of harm when the Officers fired their weapons.[36]

First, it is undisputed that the Officers did not deploy deadly force immediately, but only after Salinas continually disregarded their commands and began continuously reaching within his vehicle. The Officer's BWC footage shows that the Officers—in total—commanded Salinas to show his hands at least 30 times and to stop reaching at least seven times. Though Brittany asserts—using De La Cruz's Affidavit—that Salinas was injured and disoriented after crashing his car and likely did not hear the Officers' commands, these details, at best, are speculation upon Salinas' state of mind.[37]

Second, the Officers did not shoot at Salinas until after he began reaching within his vehicle. Brittany argues that the Officers did not see Salinas with a gun, and that he reached within his vehicle to find his cell phone. Perhaps, but "officers use lethal force justifiably if they reasonably believe the individual is reaching for a gun . . . even in cases when officers had

---

[35] *Graham*, 490 U.S. at 396. *See also* Op. at Section V(B).

[36] *See Graham*, 490 U.S. at 396.

[37] *See Twombly*, 550 U.S. at 555. Furthermore, Brittany Salinas' assertion that Salinas likely did not register the Officers' commands given the "high noise level underneath the freeway overpass" is undermined by De La Cruz's statements and Plaintiff-Appellant's own admissions in her Second-Amended Complaint. In his affidavit, De La Cruz stated that he heard the Officers yelling: "stop moving, stop moving your hands!" over the phone. Furthermore, Brittany Salinas admits in her Second-Amended Complaint that Salinas held "his hands up on several occasions for a few seconds at a time" and "moved around from side to side" while the Officers were issuing commands. The Officers' BWC footage independently confirms this, indicating that Salinas registered their commands to keep his hands up.

No. 23-20617

not yet seen a gun when they fired, or when no gun was ever found at the scene."[38] The Officers did not violate Salinas' Fourth Amendment right to be free from excessive force.

## D.

In the alternative, Brittany asserts that that the district court abused its discretion when it denied leave to amend her Second-Amended Complaint under FED. R. CIV. P. 15(a). Though leave to amend under Rule 15(a) is to be freely given, "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile."[39] Here, Brittany has already amended her complaint twice, and in her motion for leave to replead a third time, did not explain how she would amend her pleadings to cure defects. We affirm the district court's denial.[40]

## VI.

As to the City of Houston, Brittany Salinas argues that the district

---

[38] *Cloud v. Stone*, 993 F.3d 379, 387 (5th Cir. 2021). *See also Manis v. Lawson*, 585 F.3d 839, 844 (5th Cir. 2009) (discussing several cases in which this Court had "found an officer's use of deadly force to be reasonable when a suspect moves out of the officer's line of sight such that the officer could reasonably believe the suspect was reaching for a weapon."). Though Defendant-Appellees also assert that Salinas "actually had a gun under the seat[,]" we need not to consider it in our analysis. Here, it is enough that the Officers saw Salinas reaching in his vehicle and reasonably believed that he was reaching for a gun, especially as he did not cease his movements on command.

[39] *Strickland v. Bank of New York Mellon*, 838 F. App'x 815, 821 (5th Cir. 2020) (quoting *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)).

[40] This Court has affirmed a district court's denial of leave to amend for similar reasons. *See Strickland*, 838 F. App'x at 821; *Goldstein v. MCI Worldcom*, 340 F.3d 238, 255 (5th Cir. 2003) (finding no abuse of discretion when the plaintiff did not proffer a proposed second amended complaint to the district court, and did not suggest in their responsive pleadings any additional facts not initially plead that could, if necessary, cure the pleading defects raised by the defendants).

court erred when it dismissed her § 1983 and TTCA claims, asserting that her pleadings sufficiently establish municipal liability. We disagree.

## A.

Brittany first argues that the City of Houston is liable under § 1983, alleging that two municipal policies led to Salinas' death,[41] and that Houston's failure to establish a policy to investigate and review misconduct constitutes deliberate indifference.

To establish municipal liability under § 1983, Brittany "must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."[42] As explained, we find no constitutional injury. And, we affirm the dismissal of the § 1983 claims against the City of Houston.

## B.

Brittany also argues that the City of Houston is liable under the TTCA, asserting that the Officers' use of government-issued firearms against Salinas was an act of gross negligence.

Brittany's claims, however, are foreclosed by our ruling on qualified immunity. And in any event, they are also barred by this Court's case law. Though the TTCA waives Houston's sovereign immunity for limited claims of negligence, this Court has held that in determining whether sovereign immunity has been waived under the TTCA, "[t]he determinative question is whether the negligence claim arises from the same facts that form the basis

---

[41] The two City of Houston policies are: (1) Houston failed to promulgate proper guidelines for the use of deadly force, and (2) Houston failed to train, supervise, and discipline officers who use excessive force in making arrests.

[42] *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009).

of the intentional-tort claim."[43] In such cases, sovereign immunity has not been waived.[44] Here, despite Brittany's assertions to the contrary, the Officers' firing of their weapons at Salinas is "inextricably intertwined with the intentional tort" of striking Salinas.[45] Because the TTCA does not waive the City of Houston's sovereign immunity here, we affirm the district court's dismissal of Brittany's claims.

## VII.

For these reasons, we AFFIRM the district court's dismissal of Brittany Salinas' claims against the Officers and the City of Houston.

---

[43] *Pena v. City of Rio Grande City*, 879 F.3d 613, 625 (5th Cir. 2018).

[44] *See id.*

[45] *Id.* On appeal, Brittany argues that the Officers' firing of their weapons at Salinas constitutes gross negligence, and that "[i]n the context of police shootings, whether it's classified as gross negligence or intentional tort would depend on the specific circumstances and the officers' intent." This assertion, however, is unsupported by this Court's case law. We also note that Brittany's own pleadings undermine her claim, as she states that the Officers "shot the Decedent multiple times at close range *with the intent* of causing serious bodily harm of death."